# CASES ARGUED AND DETERMINED

IN

# THE SUPREME COURT,

## JANUARY TERM, 1857.

~~~~~~~~~~~~~~~~~

### BILLINGS v. HALL.

The Amendatory Act of 1855 repeals section six of the Statute of Limitations of 1850, and the five years allowed for the commencement of real actions, only begins to run from the date of the passage of the Amendatory Act.

The Amendatory Act does not divest rights vested under the old law; for Statutes of Limitations affect the remedy, and not the right.

The provisions of the "Settlers' Act" of 1856, requiring the party recovering in ejectment to pay the defendant the value of his improvements, *it seems*, are not in violation of the provision of the Federal Constitution, prohibiting States from passing laws impairing the obligation of contracts. All questions of property are within the jurisdiction of the respective States, and the individual members thereof, in forming a government, are not considered as contractors with such government, in the sense employed in the Constitution of the United States.

Neither are the provisions of said act in violation of the treaty with Mexico, by which the United States only undertook to maintain the rights of Mexican citizens to their property, until the admission of the Territory as a State.

The Constitution of this State declares, among the inalienable rights of each citizen, that of acquiring, possessing, and protecting property. This is one of the primary objects of government, is guarantied by the Constitution, and cannot be impaired by legislation.

The Settlers' Act of 1856 does not discriminate between an innocent and a tortious possession, nor is it a mere attempt to avoid circuity of action, by providing for an equitable adjustment of the whole subject in one suit. By its terms, it applies to past as well as present cases. It takes from a party that which before was his; for if he refuses to pay for the improvements put on his land, against his will, by a trespasser, he loses not only the improvements, but the land itself. Such legislation is repugnant to morality and justice, and in violation of the letter and spirit of the Constitution.

*Per Burnett, J.*—The grant of "legislative power," in the Constitution, does not include

the right to attack private property, for that would defeat one of the great ends for which governments are established.

A government with no limits but its own discretion is not a constitutional government, in the true sense of the term.

The right of protecting property, declared inalienable by the Constitution, is not the mere right to protect it by individual force, but the right to protect it by the law of the land, and the force of the body politic.

The right to regulate the mode of redressing injuries belongs to the Legislature, but when, under the semblance of a change of the remedy, a substantial existing right is defeated, impaired, or abridged, the act is null and void.

The act of 1856 assumes to divest the rights of parties in property, vested in them by laws existing at the time they acquired the property, and, further, it denies the owner the right to the rents and profits of land, accruing prior to the date of a patent, although the patent is but a declaratory affirmance of a pre-existing, valid, and acknowledged right.

*Per Terry, J., dissenting.*—Section first of Art. I of the Constitution is a mere reiteration of a truism, and cannot be construed as a limitation upon the power of government.

The effect of section first of Art. IV of the Constitution is to confer upon the Legislature all the legislative powers possessed by the people themselves, unless limited by some constitutional provision; and the Courts, in determining the validity of a statute, can only consider whether it is in conflict with any express provision of the Constitution.

The consideration of the justice or policy of a statute, and its effect upon the general welfare of the State, is addressed to the discretion of the Legislature, and, having been decided by the Legislature, is not a proper subject of judicial inquiry.

APPEAL from the District Court of the Sixth Judicial District.

This was an action of ejectment, to recover possession of certain town lots, in the city of Sacramento. The complaint merely alleges that the grantor of the plaintiff was seized in fee and in possession, of the land, and had conveyed to plaintiff, Billings, and further alleges that defendant is wrongfully in possession, but but does not allege that the title under which he claims is derived from the Spanish or Mexican governments. Among other defences, the defendant plead the Statute of Limitations, and the "Settler Law" of 1856, and claimed the value of his improvements. The jury, under the direction of the Court, brought in a special verdict, by which they find : First, that the defendant, and those under whom he claims, had been in possession of the lots in controversy, adversely to the plaintiff, for five years prior to the commencement of this action ; Second, that, independent of the adverse possession of the defendant, the plaintiff would be entitled to the possession of the lots ; Third, that the value of the lots is two thousand dollars ; and, Fourth, that the value of the improvements is nineteen hundred dollars.

On the trial, the plaintiff put in evidence the grant of the Mexican government, to John A. Sutter, of the tract known as New Helvetia, of which the premises in controversy form a part, and the decree of confirmation of the grant, by the Board of U. S. Land Commissioners ; also, Sutter's possession of certain portions of the tract, under the grant, and the mesne conveyances from Sutter down to the plaintiff. As to the second proposition submitted to the jury, the Court instructed them that, if they

believed, from the evidence, that John A. Sutter entered into actual possession of a part of the tract of land mentioned in the grant from the Mexican government, to said Sutter, and held the same under said grant, and that the lots in controversy are embraced within the boundaries of said grant, they should find that proposition for the plaintiff. The Court below entered judgment in favor of defendant. Plaintiff moved for a new trial, which was overruled, and plaintiff appealed.

*Harmon & Sunderland* for Appellant.

*Moore & Welty* for Respondent.

MURRAY, C. J.—This was an action of ejectment. The Court below directed the jury to find a special verdict, upon which a judgment was entered for the defendant.

Two questions are presented by the record; first, whether the plaintiff's action is not barred by the Statute of Limitations; and, second, the constitutionality of the act of March 26, 1856, entitled "an act for the protection of actual settlers, and to quiet land-titles in this state,"so far as the same requires a party, recovering possession of lands in an action of ejectment, to pay the defendant the value of his improvements. On the trial of the cause, the defendant set up possession for five years, under claim of an adverse title.

In the case of Billings v. Harvey & Tibbetts, decided at the October Term, 1856, we had occasion to examine the sixth section of the act of April, 1855, limiting the time of commencing actions for the recovery of real estate to five years, and we then held, that the act of 1855 repealed the sixth section of the act of 1850, and that the time only commenced to run from the date of the last act. Now, the first act was passed on the twenty-second of April, 1850, and the last one on the eleventh of April, 1855. The time commenced to run, under the first statute, from the date of its passage, and the full measure of five years had not expired, on the repeal of the old law, by eleven days; so that the bar had not occurred before the repeal of the statute.

The learned counsel for the respondent, however, contend that the decision referred to cannot affect this case; that the amendment could not have a retrospective action, or divest rights which had become fixed and vested under the old law.

The error of this argument, as we conceive, consists in a misapprehension of the true object of the Statute of Limitations. These statutes have been properly denominated statutes of repose, because the law, for the purpose of preventing litigation, has wisely determined that there should be some period affixed, beyond which a party ought not be allowed to assert stale demands, and that the presumption of payment or of title ought to

arise after he had neglected to assert his right for a certain length of time.

Much learning has been exhausted upon this subject by the Courts of England and the United States, the result of which may be thus briefly stated: That statutes of limitation are designed to affect the remedy, and not the right, or contract; that they do not enter into the contract as a part of the law thereof; and that it would be inconsistent with sound morality and wise legislation, to suppose that it was ever intended, that when a party gave his obligation to pay a particular debt, he was presumed to have had in his mind a particular period of time, beyond which, if he protracted his obligation, his liability would cease. If it be true, (and there can be no doubt of the correctness of this proposition,) that these statutes only affect the remedy, and do not destroy the right, then it follows, as a necessary consequence, that the Legislature may, by a repeal of the act, revive the right which has not been extinguished, but has been in abeyance for want of a remedy to assert it. There may be some apparently contradictory decisions, but they will be found, on examination, to result from the particular phraseology of the laws under which they arise.

The cases cited from Louisiana and Texas, arose under the doctrine of prescription, which obtained in those States, and which differs materially from statutes of limitation. Prescription is defined by civilians to be a "right by which a mere possessor acquires the property of a thing which he possesses by the continuance of his possession during the time fixed by law. The prescription by which debts are released, is a peremptory and perpetual bar to every species of action, real or personal, when the creditor has been silent for a certain time without urging his claim." So that the difference between statutes of limitation, as they are known to Courts of common law, and the law of prescription, consists in this: That the one confers a right, and the other takes away a remedy. This difference has led to the adoption of different rules in the computation of time, where the old law has been repealed, and a new one enacted; and the Supreme Court of Louisiana, following the decision of the Court of Cassation in France, has held, in the case of Goddard's Heirs v. Urguharb, 6th La. Rep., "that where the law is changed after the prescription begins to run, the time which elapsed under the law preceding the alteration, is to be computed according to that law, and that which follows is to be computed according to the new law, and the time acquired under the old law is to be added to that acquired under the new law, in the proportion that each time bears to the term required by the old and new laws."

In the case of Gautiers v. Franklin, the Supreme Court of Texas has gone further, and held, that where the old law had been repealed, and a new one enacted one year after such repeal,

the time elapsing between the two acts might also be computed. This decision does not recommend itself in any manner to our approbation, and could not be maintained, on principle, in any respectable Court in the United States. The case of Ross et al. v. Duval, 13 Pet., is not in point. There, the statute had run the full time. The question was, whether the United States Courts should enforce the statute of the State. After the statute had been running for seven years, it was adopted by process act of Congress, and it was made the duty of the United States Courts to enforce it. The opinion of the Judge, who delivered the decision of the Court upon the rule as to the computation of time, may be regarded as mere dictum, and is not sustained by reason or authority. See The Trustees, etc., v. Chamberlain et al., 14 Illinois Rep., 495, and Gillman v. Cutts, 3 Foster N. H., 376.

Having thus, as we conceive, successfully demonstrated that acts of limitation affect the remedy, and not the right, and that they have no retrospect beyond their passage, we will proceed to consider the second proposition involved in this case.

This question is not free from embarrassment, not on account of any doubts we have upon the subject, treating it as purely a legal question, but because it has heretofore entered largely into the politics of this State, and become a most fruitful source of private animosity, and public discord. In addition to this, the reports of many of the States of this Union are filled with decisions seemingly sustaining the constitutionality of such a law, while, in fact, those decisions, for the most part, were predicated upon local statutes, which differ, toto cœlo, from the one now under investigation.

It has been contended that the act of 1855 violates that provision of the Federal Constitution which prohibits the State from passing laws impairing the obligations of contracts; that such contracts may be express or implied, executed or executory, and that there is, as between a State and its citizens, an implied contract for the protection of rights and property, antecedently acquired.

We are not disposed to give much weight to this argument. We think it springs from a misconception of the true relation that exists between the State and Federal governments; that the State governments have the exclusive right to regulate their own internal or domestic affairs, except when they have expressly parted with the power; that all questions of property are within the jurisdiction of the respective States, and that the individual members thereof, in forming a government, are not to be considered as contractors with the government thereby ordained, in the sense in which that term is employed in the Constitution of the United States. It is but fair to suppose that individuals who sacrifice, or part with, a portion of their natural rights for

the common good of all, have just reason to believe that the rights reserved will be respected or maintained inviolate, but this agreement is a social compact, and not *stricti juris* a contract.

Whether a Legislature can pass laws which would operate to divest these reserved rights, and which would be obnoxious to the plainest principles of justice and morality, is a question upon which there is much diversity of opinion, and which we propose to examine in connection with the case before us. Suffice it to say, that so far as it is sought to bring this law within the scope of the constitutional inhibition of the United States, we know of no decisions which would support the proposition, except those made by the Supreme Court of Tennessee, and we cannot give our sanction to the reasoning of those cases.

It is, however, contended, that the act of the Legislature violates the provisions of the treaty of Guadalupe Hidalgo. By reference to the ninth article of that instrument, it will be observed that the United States only undertakes to maintain Mexican citizens in their rights of property, etc., until the admission of the territory as a State, after which period it was well understood that they must hold their property in subordination to the Constitution and laws of said State. If this treaty, or if the Constitution of the United States, could be held to apply to laws like the present, it is apparent that the rule must be extended further, and that all legislation touching the property, or affecting the rights of the citizen, might be successfully attacked, and that State sovereignty would become, in point of fact, but another name for State imbecility.

Having premised, thus far, with regard to the act, so far as it is supposed to conflict with the Federal Constitution, we come now to inquire whether it can be upheld under the Constitution of this State. Section first of Article I of the Constitution of California, declares that "all men are by nature free and independent, and have certain inalienable rights, amongst which are those of enjoying and defending life and liberty, acquiring possession, protecting property, and pursuing and obtaining safety and happiness." This principal is as old as the Magna Charta. It lies at the foundation of every constitutional government, and is necessary to the existence of civil liberty and free institutions. It was not lightly incorporated into the Constitution of this State as one of those political dogmas designed to tickle the popular ear, and conveying no substantial meaning or idea; but as one of those fundamental principles of enlightened government, without a rigorous observance of which there could be neither liberty nor safety to the citizen.

If, then, one of the primary objects of government is to enable the citizen to acquire, possess, and defend property, and this right has been guarantied by the Constitution, how can it be impaired by legislation? It will not be denied that the Legis-

lature possesses uncontrolled power over the subject of the remedy or process of her Courts, but when the remedy is so altered as to affect the right, then it becomes a question, how far such legislation is legitimate, the only question of difficulty being, in many cases, to draw the line of demarkation between the right of property and the remedy. A right to land, in its broadest sense, implies a right to the possession, and the profits accruing therefrom, since without the latter the former can be of no value. Thus, a devise of the profits of land, or even a grant of them, will pass a right to the land itself. Shep. Touch., 93 ; Coke on Lit., 4 B. "For what," says Lord Coke, " is land, but the profits thereof?" At common law, the owner of the soil held to an indefinite extent both upwards and downwards, (" *cujus est solum, ejus est usque ad cœlum,*" is the maxim of the law—2 Black., p. 8,) and every erection or improvement upon the soil became at once a part of the freehold, which could not be removed by the intruder, who became, in fact, liable as a trespasser, no matter what was the value of his improvements. So that where a party recovered in an action of ejectment, he was entitled not only to the improvements that had been made on his land, but had also his action for mesne profits.

"We are not aware," say the Supreme Court of the United States, in the case of Green *v.* Biddle, " of any common law case which recognizes the distinction between a *bona fide* possessor, and one who holds *mala fide* in relation to the subject of rents and profits; and we understand Liford's case as fully proving that the right of the true owner to the mesne profits is equally valid against both." "It is laid down, we admit, in Coulter's case, 5 Co., 30, that the disseizor, upon a recovery against him, may recoup the damages to the value of all that he has expended in amending the houses. (See, also, Bro. tit. Damages, pl. 82, who cites 24 Edw. III, 50.) If any common law decision has ever gone beyond the principle here laid down, we have not been fortunate enough to meet with it. The doctrine of Coulter's case is not dissimilar in principle from that which Lord Kaines considers to be the law of nature. His words are, ' It is a maxim, suggested by nature, that reparations and meliorations bestowed upon a house, or on land, ought to be defrayed out of the rents. By this maxim we sustain no claim against the proprietor for meliorations, if the expense exceed not the rents levied by the *bona fide* possessor.' "

It may, however, be contended, that the statute under consideration follows the rule adopted by Courts of Chancery, and that the principles of equity jurisprudence on this subject are the same as those embodied in the act. This suggestion is ably answered by Judge Whyte, in the case of Nelson *v.* Allen and Harris, 1 Yerger, which was a case arising under a similar statute to that of this State.

"It only remains," says the learned Judge, "for me to notice whether equity has recognized this claim for improvements given by these acts of Assembly. The argument has adverted to the civil law on this point, and detailed its various reasoning on the question, and then has said, that it is competent for the Legislature to change the former, and give that remedy at law upon ejectment or trespass, which was afforded upon a bill in equity. This argument is begging the question. It is admitted the Legislature may change the former, but it is altogether an unfounded assumption, that equity has sustained a bill for the claim of improvements by the occupant, whether he be the original intermeddler, or claimant by title under him, with or without notice. No case has been cited showing such a precedent, nor have I been able to find one. As we have seen, neither the law, nor the principles of law, give such a right; it is difficult to perceive how equity could give it, for *equitas sequitur legem.* In the Court of Chancery in England, and by the Act of 1782, ch. 11, our Courts of Equity possess all the powers and authorities which the Court of Chancery possessed under the colonial government, being the same as in England; there Lord Hardwicke says, 3 Atk., 130: "Where a man brings his bill in this Court, where there is a trust and a more equitable title,—there, he shall recover the estate, and the Court will give him an account of the rents and profits, and from the time the title accrued, unless under special circumstances, and then they will restrain to the time of bringing the bill; as where the defendant had no notice of the plaintiff's title, nor had the deeds and writings in his custody, in which the plaintiff's title appeared, or when the plaintiff's title appeared by deeds in a stranger's custody;" in all which cases, and others similar to them in principle, the account is confined to the time of filing the bill. In the case of an infant plaintiff, he says nothing can be clearer, both in law and equity, and from natural justice, than that the plaintiff is entitled to the rents and profits, from the time the title accrued. Such is the rule in Courts of Equity, and it recognizes the plaintiff's title only, not that of the defendant or occupant. It considers the defendant or occupant as having none by his possession or occupancy, and participation of the fruits and profits, it is not once noticed as an existence or as giving a right or color of right. The plaintiff's case is only looked to. Is it his land, his estate? If so, an account of rents and profits is decreed to him, of course, as the consequence of property. The time from which the account shall be taken, is influenced in some special cases by circumstances, affecting the plaintiff's recovery by diminution in its quantity, operating in favor of defendant, of course, not by way of meritorious claim from the nature of his possession, but by subtraction from the plaintiff for neglect or default."

See also the case of Green v. Biddle, 8 Wheaton, before cited.

Billings *v.* Hall.

Aside from the exceptions enumerated in the foregoing decisions, which all proceed upon the doctrine of excusable ignorance on the part of the occupant, or culpable silence on the part of the real owner, it will be hard to find any plausible reason why the owner of land should be charged with the value of improvements, neither authorized nor desired by him.

"It is difficult," says Judge Story, "to perceive the foundation of the equitable or moral obligation, which should compel a party to pay for improvements that he had never authorized, and which originated in tort. If every man ought to have the fruits of his own labor, that principle can apply only to a case where the labor has been lawfully applied, and the other party has voluntarily accepted those fruits, without reference to any exercise of his own rights. For, if in order to avail himself of his own vested rights, and use his own property, it be necessary to use the improvements wrongfully made by another, it would be strange to hold that a wrong should prevail against a lawful exercise of the right of property. In case of a tortious confusion of goods, the common law gives the sole property to the other party."

Again, say the Supreme Court of the United States, in 4 Peters, 110, "There is no moral obligation which should compel a man to pay for improvements on his own lands, which he never authorized, and which originated in a tort." Having thus established the proposition that, both at law and equity, the lawful owner who has been dispossessed of land is entitled, upon a recovery, both to the profits and the improvements that have been made thereon, and such having been the law of this State, since the adoption of the Constitution down to the passage of the act of 1856, let us examine how far it trenches upon the principles of natural justice, and the provisions of the Constitution.

The act does not discriminate between an innocent and a tortious possession. It is not an attempt to avoid a circuity of action, by providing for an equitable adjustment of the whole subject in one suit; it applies as well to the trespasser who has made unlawful and violent entry upon the lands of another, as to him who has used diligence to ascertain his neighbor's right, and whose conduct has been marked by good faith and fair dealing. It applies as well to past as future cases. That which, before, was mine, is by this act taken from me, either in whole or in part, for if I refuse to pay for the improvements which were put upon my land by a mere trespasser, and which were mine by the law, before the passage of the statute, I lose not only the improvements, but the land itself, and that which is mine to-day, may be taken from me to-morrow, by any intruder who wishes to enter upon it.

"Nothing can be more clear, upon principles of law and reason, than that a law which denies to the owner of land, a reme-

dy to recover the possession of it, when withheld by any person, however innocently he may have obtained it; or to recover the profits received from it by the occupant; or which clogs his recovery of such possession and profits, by conditions and restrictions tending to diminish the value and amount of the thing recovered, impairs his right to, and interest in, the property. If there be no remedy to recover the possession, the law necessarily presumes a want of right to it. If the remedy afforded be qualified and restrained, by conditions of any kind, the right of the owner may indeed subsist, and be acknowledged, but it is impaired, and rendered insecure, according to the nature and extent of such restrictions." 8 Wheaton, 75.

Such legislation is repugnant to the plainest principles of morality and justice, and is violative of the spirit and letter of our Constitution. It divests vested rights, attempts to take the property acquired by the honest industry of one man, and confer it upon another, who shows no meritorious claim in himself.

It has been erroneously supposed, by many, that the Legislature of a State might do any act, except what was expressly prohibited by the Constitution. Whether there is any restriction upon legislative power, irrespective of the Constitution, is a question upon which ethical and political writers have differed. Many of the ancient writers have based this claim of omnipotence upon the doctrine of the absolute and sacred character of sovereignty, assuming that princes bear rule by divine right, and not by virtue of the expressed or tacit consent of the governed. Some contend that the very existence of government depends upon the supreme power being lodged in some branch of the government, from which there is no appeal, and, if laws are passed which are immoral, or violate the principles of natural justice, the subject is bound to obey them. Others contend that there are boundaries set to the exercise of the supreme sovereign power of the State, that it is limited in its exercise by the great and fundamental principles of the social compact, which is founded in consent, express or implied; that it shall be called into existence for the great ends which that compact was designed to secure, and, hence, it cannot be converted into such an unlimited power, as to defeat the end which mankind had in view, when they entered into the social compact.

Among the advocates of the former system are Paley and Burke, and of the latter, Vattel and Locke. Locke contends "that the great end of man's entering into society being the enjoyment of property in peace and safety, and the great instrument and means of that being the laws established in that society, the first and fundamental positive law is the establishing of the legislative power; the first and fundamental natural law which is to govern the Legislature itself, is the preservation of the society, and so far as consistent with public good, every

person in it. While on the one hand, he concedes the doctrine that the legislative power is not only the supreme power of the commonwealth, but sacred and unalterable in the hands where the community have placed it, the edict of any, in what form soever conceived, or by what power soever backed, cannot have the force and obligation of a law without the sanction of the Legislature, which the public has chosen and appointed, and in whom the legislative power is invested by the consent of those for whom they are to legislate; on the other hand, he contends that though the legislative be the supreme power, it cannot possibly be absolutely arbitrary over the lives and fortunes of the people. For, it being but the joint power of every member of society, given up to that person or assembly which is the legislative, it can be no more than those persons had in a state of nature before they entered into society, and gave up their natural rights to the community; for nobody can transfer to another more power than he has in himself, and nobody has an absolute, arbitrary power over himself or over any other, to destroy his own life, or to take away the life or property of another. A man cannot subject himself to the arbitrary power of another, and having in the state of nature no arbitrary power over the life, liberty, or possession of another, but only so much as the law gave him for the preservation of himself and the rest of mankind, this is all that he doth or can give to the commonwealth, and by it to the legislative power; so that the Legislature can have no more than this. Their power, in the utmost bounds of it, is limited to the public good of the society. It is a power that hath no other end but preservation, and therefore can never have a right to destroy, enslave, or designedly to impoverish the subject. Thus, the law of nature stands as an eternal rule to all men, binding upon legislatures as well as others. The fundamental law of nature being the preservation of mankind, no human sanction can be valid or good against it. That the legislative or supreme authority cannot assume to itself a power to rule by temporary arbitrary decrees; but is bound to dispense justice, and to decide the rights of the subject, by promulgated standing laws, and known authorized judges. To avoid the inconveniences which disorder men's property in a state of nature, they unite in societies. The object of this union is, that they may have the united strength of the whole to secure and defend their property, and may have standing rules to bound it, by which every one may know what is his. It is to this end men give up their natural powers to society, which puts the legislative powers into such hands as they think fit with this trust; that they shall be governed by declared laws. Absolute -arbitrary powers, or governing without settled standing laws, can neither of them, consist with the ends of society and government; and men would not quit the freedom of a state of nature,

and tie themselves up under a government, were it not to pre‾ serve their lives, liberty, and fortunes, by stated rules of right and property. It cannot be supposed that they should intend, had they the power to do so, to give any one or more an absolute, arbitrary power over their persons and estates. For this were to put themselves in a worse condition than a state of nature, wherein they had the liberty to defend their rights against the injuries of others, and were upon equal terms; whereas, by supposing that they have given up themselves to the absolute, arbitrary power of the legislator, they have disarmed themselves, and armed him to make a prey of them when he pleases. The supreme power cannot take from any man his property without his own consent, for the preservation of property being the end of government, and that for which men enter into society, it necessarily supposes and requires that the people should have property and be protected in it, without which they must be supposed to lose by entering into society, the very thing which was the end and design of the social compact to secure, and for the attainment of which they entered into it. If this position be true, it was fallacious to think that the supreme or legislative power of any commonwealth can do what it will, irrespective of the principles of natural justice, or dispose of the estates of the subjects arbitrarily, or divest vested rights at pleasure."

In England, the doctrine of parliamentary omnipotence has often been asserted; but, notwithstanding the declaration of Lord Coke, " that the power and jurisdiction of Parliament is so transcendental and absolute, that it cannot be controlled or confined, either for person, or cause, within any bounds," it has been doubted by learned judges, whether an act which contravened the principles of natural justice could be upheld, and whether Parliament could make a man a judge in his own case. This doctrine has undergone some modification in England.

" It is undoubtedly true," says Mr. Smith, in his Commentaries on Statutory and Constitutional Construction, p. 255, " that the Parliament of England, notwithstanding the doctrine of its omnipotence, certainly in modern times, has been greatly restrained by the force of public opinion, from interfering with or divesting vested rights. It has not, in fact, dissolved in an arbitrary manner any corporation, since the instance of the suppression of the order of Knights Templar, in the time of Edward II, which was in the early part of the fourteenth century; and of the religious houses in the reign of Henry VIII; so that the doctrine that the power of Parliament is omnipotent, may at this time be considered as resting mainly on theory. When, in 1783, a bill was introduced into Parliament, by Mr. Fox, for the purpose of annulling the charter of the East India Company, it was successfully resisted by Mr. Pitt, Lord Thurlow, and others, as being

Billings v. Hall.

subversive of the law and constitution of the country; mainly on the ground that the act was a tyrannical one, which broke through every rule of British justice, being an attack upon a most solemn charter, affirmed and confirmed by the sacred faith of Parliament. It broke through all those ties which bind man to man; was fraught with the most pointed mischief against national honor and legislative integrity, and its passage would take away all security to individuals that private property would not be destroyed by legislative tyranny."

Whatever doubt may have formerly existed on this subject, the question has been settled, by an overwhelming weight of authority, in this country, that the spirit of free institutions is at war with such a principle.

In the case of Taylor v. Porter, 4 Hill, Judge Bronson, one of the ablest judges that has ever adorned the bench of this or any other country, after admitting the right to take private property for public use, held " that there was no provision in the Constitution that just compensation should be made to the owner, when his property is taken for private purposes. If the power exists to take the property of one man, and transfer it to another, it may be exercised without any reference to compensation. The power of making bargains for individuals has not been delegated to any branch of the government, and if the title of A can be, without his fault, transferred to B, it may as well be done without, as with consideration. This view of the question was sufficient to put them on inquiring where can the power be found to pass such a law as that under which the defendant attempted to justify? It is not to be presumed that such a power exists, and those who set it up, should tell us where it may be found. Under our form of government, the Legislature is not supreme. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people; like other departments of government, it can only exercise such powers as have been delegated to it, and when it steps beyond that boundary, its acts, like those of the most humble magistrate in the state, who transcends his jurisdiction, are utterly void."

Where then shall we find a delegation of power to take the property of A and give it to B, either with or without compensation?

Only one clause in the Constitution can be cited in support of the power, and that is the first section of the first article, where the people have declared that " the legislative power of the state shall be vested in a Senate and Assembly." He admitted that the two houses, subject only to the qualified negative of the Governor, possessed all " the legislative power of the State;" but the question immediately presents itself, what is " legislative power," and how far does it extend? Does it reach the life, liberty, or property of the citizen, who is not charged with trans-

2

gression of the laws, and where the sacrifice is not demanded by
a just regard for the public welfare.   The security of life, liber-
ty, and property, lies at the very foundation of the social com-
pact; and to say that this grant of " legislative power " includes
the right to attack private property, is equivalent to saying that
the people have delegated to their servants the power of defeat-
ing one of the great ends for which governments were estab-
lished.   If there was not one word of qualification in the whole
instrument, he should feel great difficulty in bringing his mind
to the conclusion that the clause under consideration had clothed
the Legislature with despotic power; such is the extent of their
authority, if they can take the property of A, either with or
without compensation, and give it to B.   "The legislative power
of the State does not reach to such an unwarrantable extent.
Neither life, liberty, nor property, except when forfeited by
crime, or when the latter is taken for public use, falls within the
scope of this power."

In the case of Wilkinson v. Sidam, 2 Peters, Judge Story says,
" that government can scarcely be deemed free where the rights
of property are left solely dependent on the legislative body,
without any restraint.   The fundamental maxims of a free gov-
ernment seem to require that the rights of personal liberty and
private property should be held sacred."   And Judge Mills, in
Fisher v. Cockrell, 5 Monroe, says :   " It is so repugnant to the
moral sense of every correct man, that the Legislature should
delude, or intend to entice, the individuals of a community, by
presenting to them rights against other individuals, under pre-
scribed rules, and after the pursuit is undertaken and drawn to
a close, at great expense, to snatch away the right and leave the
pursuer to pay the cost of the pursuit, that it might be argued,
and with some plausibility, that such a delegation of power was
not within the terms of the compact, that it is a right never
ceded to any department of the government by the people when .
they gave the delegated powers which they have conferred by
the Constitution."

Other authorities might be cited to the same effect, but they
are so numerous that it would require a volume to contain them.
Having, as we think, satisfactorily established the doctrine, that
the Legislature cannot pass a law divesting vested rights, we
apprehend no difficulty in maintaining the proposition, that the
act under advisement has this effect ; and if a law which imposes
upon a party, as a condition of the recovery of his property,
payment for the improvements which were his already, or denies
him the rents and profits of the land, can be upheld, then an act
which divests the right entirely could be maintained, as we see
no difference in the principle between taking a part and taking
the whole.

Our attention has been called to numerous cases decided by

Billings *v.* Hall.

the tribunals of other States. We have examined them all, and without referring to them especially, believe that we are warranted in saying that there is no case to be found like the present; that the laws upon which those decisions were made provided alone for the case of a party who had entered innocently upon lands, believing he had a good title; that in some of these cases no constitutional objection was urged; that in many, it was not claimed that the law had a retrospective action; and that in none was it held that the Legislature could authorize one man to intrude upon the lands of another, or offer a premium to fraud and violence. The object of all the statutes which we have seen on this subject, was to allow the defendant the benefit of his equities in an action of ejectment, instead of driving him to a Court of Chancery.

The policy of most of the States has been to encourage settlement in good faith upon vacant lands as a means of developing agricultural interests, and the wisdom of that policy has manifested itself in the rapid growth of the West and South-west.

However desirable such a policy may be, and however necessary to the interest of this State, it ought not to be encouraged or maintained when founded in wrong and injustice to her citizens. It is a law as immutable as those of nature, that States and nations, like individuals, are bound to obey the principles of natural justice in all their dealings with their subjects and others, and while a seeming temporary prosperity may follow the infractions of this rule, the day of retribution must come as certainly as effect follows cause.

It has become common in our Courts to denounce titles similar to the one under which the plaintiff claims, and it is useless to disguise the fact, that they are unpopular with the people at large, owing, probably, to the circumstance that many grants have been forged for the purpose of covering improvements made in good faith; but this prejudice should be confined to such fraudulent grants, and ought not to be extended to all alike. The decisions of this Court prior to the decision of the Fremont case by the Supreme Court of the United States, have prevented the holders of *bona fide* titles from commencing suits for the recovery of their property, and it would be a great wrong to hold that they had lost their rights for not doing what the law had previously held they could not do. In the present case, there is no pretence of fraud. The early pioneers of California, who encountered so many dangers and privations in settling this country and developing its wealth and resources; who have laid the foundation of a new empire, and opened to the world a new field of wealth and enterprise, would have cause to complain of injustice, and to denounce the fairness and policy of a government which took from them the honest acquisitions of toil and danger

to enrich needy adventurers, upon the shallow pretext of policy, and under the false assumption of legislative omnipotence.

Judgment reversed, and new trial ordered.

BURNETT, J.—I concur with the Chief Justice in the judgment rendered, and in the general views expressed in the opinion delivered. As the subject is one of so much interest and importance, I had intended giving a separate opinion; but the very full examination of my associate, renders this unnecessary. I will, however, submit the following positions, which I take to be true in themselves:

1. That a government with no limit but its own discretion, is not a constitutional government, in the true sense of the term.

2. That the end and object of creating a Constitution, is to limit, classify, and direct, the powers of the different departments.

3. That a Constitution is a solemn compact, deliberately and freely entered into by a free people as between themselves, by which they limit the powers of their agents, the powers of majorities, and the powers of themselves; that this compact is made in advance, when men are more free from passion and prejudice—when no one can see foresee whether he will fall with the majority or with the minority—when there is no interest to subserve, but equal and exact justice—and when the only object is to lay down those fundamental and eternal principles, under the practical application of which, every man may enjoy the rights and privileges of human nature, and the protection and happiness incidental to society well regulated.

4. That there are certain inherent and inalienable rights of human nature that no government can justly take away—that some of these rights have been enumerated in our State Constitution, and in the language of that instrument, "This enumeration of rights shall not be construed to impair or deny others retained by the people."

5. That among the inalienable rights declared by our Constitution as belonging to each citizen, is the right of "acquiring, possessing, and protecting property."

6. That this right of "protecting property" is not the simple right of protection by individual physical force, but the right to protect it by the law of the land, and the force of the body politic.

7. That the question as to what constitutes a title to property must depend for its solution upon the *laws as they exist at the very time when the right accrues.*

8. That the citizen who obeys the laws of to-day, and under their deliberate and solemn sanction acquires a right to property, cannot be deprived of his property, by any retrospective act, passed to-morrow, requiring him to pay for that which, by the existing law, was already declared to be his own.

Billings *v.* Hall.

9. That if the Legislature could, by such retrospective act, divest rights already legally and lawfully vested, there would be no limit, so far as this inalienable right is concerned, but its own discretion.

10. That for the Constitution to declare a right inalienable, and at the same time leave the Legislature unlimited power over it, would be a contradiction in terms, an idle provision, proving that a Constitution was a mere parchment barrier, insufficient to protect the citizen, delusive and visionary, and the practical result of which would be to destroy, not conserve, the rights it vainly presumed to protect.

11. That if the Legislature cannot *directly* take from the citizen that property which the existing law declares to be his, and give it to another, then the law-making power cannot accomplish the same practical end by indirect means.

12. That if this great right could be defeated, simply by varying the *form* and *mere mode* of arresting it, then our system would be idle and nugatory, impracticable and unsafe, and wholly unworthy the name of a stable system of *constitutional law.*

13. That the right to regulate the *mode* in which parties shall prosecute their remedies for redress of injuries justly belongs to the legislative department, but when, under the semblance of a change of remedy, a substantial existing right is defeated, impaired, or abridged, the act is null and void, because it then ceases to regulate the mere *remedy,* and impairs the real *right.* .

14. That if the law, as it exists to-day, vests certain property in one citizen, and the Legislature could to-morrow pass an act depriving him of all remedy to " protect " that property, except by parting with a portion of the same, then the Legislature would have an equal right to say, that a party who is sued for his own property shall not be permitted to plead his title in defence of the action, unless he will consent to give up a portion of his property to the plaintiff; for the Legislature could equally deny the right to the defendant as to the plaintiff, in such a case.

15. That the act of the Legislature referred to does assume to divest the rights of property vested in parties, by the laws existing and in force at the time these rights accrued, and so clogs the remedy as to defeat that part of the Constitution which guaranties to every man the right of protecting his property, through the Courts and officers of the State.

16. The act in question denies the owner all right to the rents and profits of the land, accruing prior to the date of the patent, whatever rights the party may have had, although the patent itself is issued in pursuance of a regular judgment, in a competent Court, against the United States, the successor to all the rights of Spain and Mexico, and which judgment and patent are but a declaratory *affirmance* of a *pre-existing,* valid, and acknowledged right.

17. That as all the claims to private lands in the State had, by the law of Congress, to pass through the U. S. Board of Land Commissioners, and the Federal Courts, if required by the government, and, upon *final confirmation,* to be patented, the practical effect of this act of the Legislature is to deny the owners all their previous rights in lands granted by Spain and Mexico, unless these owners have complied, in the *past,* with the then unknown provisions of the tenth section, *now first enacted,* but which these owners were not required to do, by any then existing law.

18. The act makes no distinction, (except in cases of "actual fraud or force,) whether the trespass was willful or mistaken, whether upon the long and well known claim of the owner, or upon wild and supposed public lands, claimed by no known or accessible person; and while the owner, under the revenue laws of the State, has been compelled to pay the taxes upon the property, or lose his land, although no patent had issued, yet, when he at last is allowed to recover the possession, he is compelled to pay the full assessed value of the improvements, without any deduction for the rents and profits, or even for the taxes he has paid the State, or the injury done to the property itself.

19. That the Legislature had the right to allow all and every right and defence, legal as well as equitable, existing under the laws in force at the time they accrued, to be set up in a suit to recover the possession of real estate, but the Legislature had no power to create new rights for one party, as to the past, nor impair the pre-existing rights of the other; and this is the true distinction between the power to regulate the *remedy,* and the want of power to impair the *right.*

20. That the hardships of particular cases, that will and must arise in the progress of human affairs, under any and all systems of government and law, do in fact constitute the true and stern test of the devotion of a free people to fundamental principles; and to sustain these fundamental principles, whereon liberty, protection, and society itself, are based, is the most conclusive proof of the capacity and fitness of a people for self-government.

21. That the permanent evils inflicted upon free institutions, by a violation of these fundamental principles, will outweigh, immeasureably, all the temporary benefits that might accrue to individuals.

22. That whatever may be the views of others, this Court has but one duty to perform, and that is to expound and enforce the Constitution, in its purity and vigor, until changed by the same sovereign power that made it.

TERRY, J.—With the utmost deference to the majority of the Court, I am compelled, reluctantly, to dissent from their opinion in this case.

After the most careful investigation, I am unable to perceive

any constitutional objection to the "Act for the protection of actual settlers, and to quiet land-titles of this State," passed March, 1856.

It is conceded, that the act does not conflict with any provision of the Constitution of the United States, or the treaty of Guadalupe Hidalgo. The opinion seems to be predicated on the grounds, that the act is void, because it is in violation of natural justice, and infringes article first of section first of the Constitution of this State. This article is a mere reiteration of a truism which is as old as constitutional government. A similar declaration is contained in the Constitutions of most of the States of the Union, but, I think, has never been construed as a limitation on the power of the government.

Such a construction might seriously affect the power of government to enact laws for the punishment of crime by the incarceration of the criminal, or to enforce the collection of debts by a seizure and sale of property.

The doctrine, that judges have power to annul a law, because, in their opinion, its provisions are in violation of natural justice, is one of dangerous consequences, tending to destroy that distribution of powers made by the Constitution, by concentrating in the hands of the judiciary, functions which are, by the Constitution, conferred on different departments, and cannot, I think, be maintained on principle or authority.

The question, whether a particular law is in violation of natural justice, may be one of difficult solution. Its determination is governed by no fixed rules, and often depends on considerations of policy and public advantage, which are more properly the subjects of legislative than judicial exposition.

Section first of article fourth of the Constitution of California, vests the legislative power of the State in a Senate and Assembly, which is designated the Legislature of California.

The effect of this article was to confer all the legislative powers possessed by the people themselves, except those limited by some constitutional provision.

In England, from which country our system of government and laws is, for the most part, taken, the power of the Legislature is held, by the most eminent jurists, to be absolute.

Sir Edward Coke says, (4 Inst., 36):

"The power and jurisdiction of Parliament is sole, transcendent, and absolute; that it cannot be confined, either for cause or persons, within any bounds. It hath sovereign and uncontrollable authority in the making, conforming, enlarging, restraining, abrogating, repealing, reviving, and expounding of laws concerning matters of all possible denomination, ecclesiastical or temporal, civil, military, maritime, or criminal; this being the place where that absolute despotic power, which must,

in all governments, reside somewhere, is intrusted by the consti-
tution of these kingdoms."

It is true, that some writers upon government have denied the
right of Parliament to enact laws contrary to the principle of
natural justice; contending that such laws are of no binding
efficacy.

In reference to these doctrines, Sir William Blackstone says:
"It must be owned, that Mr. Locke, and other theoretical
writers, have held, that there remains still inherent in the peo-
ple a supreme power to remove or alter the legislative, when
they find the Legislature act contrary to the trust reposed in
them; for, when such trust is abused, it is thereby forfeited, and
devolves to those who gave it. But, however just this conclu-
sion may be in theory, we cannot practically adopt it, nor take
any legal steps for carrying it into execution under any dispen-
sation of government at present actually existing. For this de-
volution of power to the people at large, includes in it the disso-
lution of the whole form of government established by that
people—reduces all the members to their original state of
equality, and by annihilating the sovereign power, repeals all
positive laws whatsoever before enacted. No human laws will,
therefore, suppose a case which at once must destroy all law,
and compel men to build afresh upon a new foundation; nor
will they make provision for so desperate an event, as must ren-
der all legal provisions ineffectual. So long, therefore, as the Eng-
lish Constitution lasts, we may venture to affirm, that the power
of Parliament is absolute and without control." 1 Com., 162.

Again, on page 185, he says, after describing the manner of
passing laws: "An act of Parliament thus made is the exercise
of the highest authority that this kingdom acknowledges upon
earth. It hath power to bind every subject in the land, and the
dominions thereunto belonging. Nay, even the King himself, if
particularly named therein. And it cannot be altered, amended,
dispensed with, suspended, or repealed, but in the same form
and by the same authority of Parliament, for it is a maxim in
law that it requires the same strength to dissolve as to create
an obligation."

Chancellor Kent, who, in point of legal knowledge and learn-
ing, stands second to no American jurist, says: "The princple
in the English government that the Parliament is omnipotent,
does not prevail in the United States; though if there be no
constitutional objection to a statute, it is with us as absolute
and uncontrollable as laws flowing from the sovereign power
under any other form of government. But in this and all other
countries where there is a written Constitution designating the
powers and duties of the legislative as well as other departments
of the government, an act of the Legislature may be void, as
being against the Constitution. The law with us must conform,

Billings *v.* Hall.

in the first place, to the Constitution of the United States, and then to the subordinate Constitution of its particular State, and if it infringes the provisions of either it is so far void." 1 Com., 449.

This doctrine is fully sustained by numerous decisions of our highest judicial tribunals. In the case of Bennett *v.* Boggs, 1 Bald. R., 74, a case involving the constitutionality of an act of the Legislature of New Jersey, regulating fisheries in the Delaware River, Mr. Justice Baldwin held, " that the Court in determining what is the law of New Jersey, must first look at the Constitution, which is the supreme law binding on the Legislature itself. If that contained any restraint on the legislative power over fisheries, its obligations are paramount, but if it contain none, the law which must govern their decision, exists only in the acts of the government, organized by the people under their Constitution.

" We may think the power conferred by the Constitution of this State too great, and dangerous to the rights of the people, and that limitations are necessary; but we cannot affix them, or act in cases arising under the State laws as if limitations had been fixed by the Constitution previously. We cannot declare a legislative act void because it conflicts with our opinion of policy, expediency, or justice. We are not guardians of the rights of the people of the State, unless they are secured by some constitutional provision which comes within our judicial cognizance.

" The remedy for unwise and oppressive legislation within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people; if these fail, the people in their sovereign capacity can correct the evil. But Courts cannot assume their rights; there is no paramount and supreme law which defines the laws of nature, or settles those great principles of legislation which are said to control State Legislatures in the exercise of the powers conferred on them by the Constitution.

" If it is once admitted that there exists in this Court a power to declare a State law void, which conflicts with no constitutional provision—if we assume the right to annul it for its supposed injustice or oppressive operation, we become the makers, and not the expounders of the Constitution. Our opinions would not be a judgment on what was the pre-existing law of the case; but upon what it is, after we have so amended or modified it, as to meet our ideas of justice, policy, and wise legislation, by a direct usurpation of legislative power, and a flagrant violation of the duty enjoined upon us by the judiciary act."

In Bradde *v.* Bramfield, 2 S. & M., 285, Huston, J., held, that there was high authority for saying there is, in every government somewhere, an absolute and despotic power. The exceptions to this are only such as are expressly specified in the writ-

ten Constitution, subject to this, and only to this, or some provision of the Constitution of the United States. The powers of the Legislature of the State to enact laws, seem not to be limited.

In the case of Harvey v. Thomas, 10 Watts, 66, which involved the constitutionality of a statute relating to private roads, the defendant argued that the Legislature had not power to authorize the application of another's property to a private purpose, even on compensation. Gibson, C. J., uses the following language:

"Who can point out any express constitutional disaffirmance of the power? The clause by which it is declared, that no man's property shall be taken, or applied to public use, without the consent of the representative, and without just compensation made, is a disabling, and not an enabling one. The power would have existed in full force without.

"Whether this power was only partially restrained for a reason similar to that which induced an ancient law-giver to annex no penalty to a parricide, or whether it was thought that there would be no temptation to the act of taking the property of one individual for another's use, it seems clear there is nothing in the Constitution to prevent it, and the practice of the Legislature has been in accordance with the principle here stated, of which the application of another's land, for the purpose of a private way, is a frequent proof."

In the case of Cochran v. Van Sarlay, 20 Wend., 381, Senator Verplanck said: "It is difficult, upon any general principles, to limit the omnipotence of the sovereign legislative power by judicial interposition, except so far as the express words of the written Constitution give that authority.

"There are many dicta, and some great authorities, holding that acts contrary to the first principles of natural justice are void. The principle is unquestionably sound as the governing rule of the Legislature, in relation to its own acts, or even those of a preceding Legislature. It also affords a safe rule of construction for Courts, in the interpretation of laws admitting of any doubtful construction, to presume that the Legislature could not have intended an unequal and unjust operation of its statutes. Such a construction ought never to be given to legislative language, if it be susceptible of any other more comformable to justice; but if the words be positive, and without ambiguity, I can find no authority for a Court to vacate or repeal a statute on that ground alone. But it is only in express constitutional provisions, limiting legislative power and controlling the temporary will of a majority by a permanent and paramount law, settled by the deliberate wisdom of the nation, that I can find any safe and solid grounds for the authority of Courts of Justice to declare void any legislative enactment. Any assumption of authority beyond

this, would be to place in the hands of the judiciary, powers too great and too undefined, either for its own security or the protection of private rights."

In the case of Calder v. Bull, 3 Dallas, 386, this question was discussed by the Supreme Court of the United States. The Judges of that Court were not agreed in their opinions on this point.

Mr. Justice Patterson held, "that if a government, composed of legislative, executive, and judicial departments, were established by a Constitution, which imposed no limit on the legislative power, the consequence would inevitably be, that whatever the Legislature choose to enact would be lawfully enacted, and the judicial power could not interfere to pronounce it void. That it was true some speculative spirit had held that a legislative act against natural justice, must in itself be void, but he could not think that under such a government any Court of Justice would possess the power to declare it so."

Mr. Justice Iredell was of opinion, " that if the Legislature of the Union, or of any member of the Union, should pass a law within the general scope of their constitutional powers, the Court could not pronounce it void merely because it was, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard; the ablest and purest men have differed upon the subject. All the Court could properly say in such an event, would be that the Legislature, possessed of an equal right of opinion, had passed a law which, in the opinion of the Judges, was inconsistent with the abstract principles of natural justice. If the Legislature pursue the authority delegated to them, their acts are valid; if they transcend the bounds of that authority, their acts are invalid. In the former case, they exercise the discretion vested in them by the people, to whom they are responsible, for the faithful discharge of their trust; in the other case, they violate the fundamental law, which must be our guide whenever we are called upon as Judges to determine the validity of legislative acts."

Laws of like character have been sustained by the tribunals of other States having Constitutions similar to ours.

In the case of Armstrong v. Jackson, (1 Blackf., 374,) the Supreme Court of Indiana held, that the Occupying Claimant Law of Indiana was not in conflict with the Constitution.

The Court say: " By the first section of this act, if the bona fide occupant is willing to pay the value of the land, without the improvements, the successful claimant shall not obtain the possession until he pays the value of the improvements, made by the occupant. We do not perceive the force of any of the objections which have been urged against this part of the act. We see no provision of the Constitution which is violated by it. It cannot be contended that it is unconstitutional for the success-

ful claimant to pay the occupant for his improvements, nor can we discover the unconstitutionality of the occupant's retaining possession of the land he has improved, until such payment is made. The Legislature might have given the occupant an action against the successful claimant, for the value of his improvements, and a lien on the premises improved, until such value was paid; and why may they not give this mode of recovering the value, at the conclusion of the action of ejectment, and make the payment a condition precedent to the recovery of possession?

"Laches in demanding a right for a certain time, may be considered either as an abandonment or as a fraud, and it is generally admitted that Statutes of Limitation may be enacted, barring the recovery of lands and tenements after a given time of adverse possession; and the length of that time is wholly at the will of the Legislature. To make valuable and lasting improvements requires time, and when made by an adverse possessor, they manifest laches on the part of the real owner, and we see nothing in the Constitution to prevent the Legislature from declaring the lapse of time necessary for making such improvements an absolute bar to recovery; hence, they may certainly make it a conditional one. They may say, that if the real owner neglects to assert his right, until the *bona fide* occupant makes valuable improvements, he shall not obtain the possession until he has paid for those improvements; but here, he is not laid under this condition, unless the occupant is willing to pay him all that is really his own: the value of the land without the improvements."

The Court, after deciding that the valuation of the commissioners was void, as in conflict with the provision of the Constitution which guarantied the right of trial by jury, decide that the unconstitutionality of the mode of ascertaining the value of improvements did not affect the right of the occupant to their value, which was given by that part of the act to which there was no constitutional objection.

In Elliott *v.* Armstrong, 4 Blackf., 424, the Court held that a party evicted by a paramount title, was liable to pay rents only for the land without improvements, if he was entitled to the improvements under the Occupying Claimant Law.

The Court say, "it appears to us, the real matter in controversy between the parties is as to the rule by which the amount of the rents and profits is to be estimated. The defendant has had the use of plaintiff's lot, and is bound to pay a fair rent for it; but he is entitled to the use of the buildings free of rent, because they were erected at his own expense, and because he has by the statute a right to their possession, until he is paid for them by the complainant."

Similar decisions were made in Ohio. See 5 Ohio, 134. In

Billings *v.* Hall.

Illinois; see 14 Ill., 173 and 431.   In Alabama, 13 Ala., 31; and in other States.

Admitting such decisions to have been made under laws which provided only for cases of *bona fide* occupation under color of title, I do not perceive how this fact can affect the question of constitutionality.   At common law, buildings erected upon land become a part of the freehold, and vest in the owner of the soil as well when erected by a person holding under color of title, as by a mere naked trespasser.   In either case such a law would operate to divest vested rights by taking the property of one citizen and conferring it upon another, or by compelling the successful claimant to pay for property which was, by the rules of common law, already his own.

The act in question would certainly have been more consonant with the principles of justice and equity if the Legislature had discriminated in favor of those occupants whose possession had been acquired in good faith and in ignorance of any outstanding title.   But the consideration of the justice and policy of the act, and its effect upon the general welfare of the State was addressed to the discretion of the Legislature, and having been decided by the Legislature, it is not a proper subject of judicial inquiry.

The sudden increase of population consequent upon the discovery of gold in California, created a large demand for the necessaries of life; the small quantity of land in actual cultivation was inadequate to supply this demand, and left us almost wholly dependent upon foreign countries.

It has been policy of the Legislature from the commencement of our State government, to encourage the settlement and cultivation of the unoccupied lands of the State by the enactment of laws to protect the actual settler in the possession and enjoyment of a limited quantity of land.

The wisdom of this policy has been demonstrated by the rapid development of our agricultural resources, which now afford not only an abundance of necessaries for home consumption but leave a surplus for exportation, a result never accomplished in any other country within so short a period.

Upon the face of the inducements offered by the Legislature, and the promise of being protected in the possession of their homes, a number of hardy and enterprising citizens settled upon lands which, in most instances, had never been surveyed or occupied, nor in any manner segregated from the public domain. Nor was there any evidence within their reach to show that such lands were claimed by any private citizen.   Most of this land was, before their settlement, of little value, paying revenue neither to the owner nor to the State; their present enhanced value is in a great measure owing to the energy and labor of the occupant, the improvements in many cases greatly exceeding the lands in value.   There are no doubt instances of wrongful and

tortious entries upon lands known to be claimed by individuals, but in a majority of cases, more especially in those portions of the State that were not inhabited before the discovery of gold mines, such entries have been made under the *bona fide* belief that the land settled upon was a portion of the public domain.

Under these circumstances we may well doubt whether it would be a greater violation of natural justice to deprive hundreds of citizens and their families of the homes erected by the labor of years, without making any compensation for the improvements which constitute a great part of the value of those homes, or to permit them to retain possession of them upon paying to the owner of the soil the full value of all that is really his own. It appears to be settled that the Legislature may enact laws by which private property may be taken for private purposes in cases where the general good would be thereby promoted. The propriety, policy, and expediency of such acts, can be properly determined on by the Legislature.

In determining the validity of an act of the Legislature the Courts can consider only whether the act is in conflict with any express provision of the Constitution. Our authority to judge is derived from the Constitution and laws of the State; we can know no power superior to the Constitution, nor acknowledge any higher law than a statute duly enacted pursuant to its provisions.