# EX PARTE NEWMAN.

*Per Terry, C. J.*—The Act of April, 1858, "for the better observance of the Sabbath," is in conflict with the first and fourth sections of article first of the Constitution of this State, and is therefore void.

The Constitution, when it forbids discrimination or preference in religion, does not mean merely to guarantee toleration, but religious liberty in its largest sense, and a perfect equality without distinction between religious sects. The enforced observance of a day held sacred by one of these sects, is a discrimination in favor of that sect, and a violation of the religious freedom of the others.

Considered as a municipal regulation, the Legislature has no right to forbid or enjoin the lawful pursuit of a lawful occupation on one day of the week, any more than it can forbid it altogether.

The governmental power only extends to restraining each one in the freedom of his conduct so as to secure perfect protection to all others from every species of danger to person, health, and property; that each individual shall be required so to use his own as not to inflict injury upon his neighbor; and these seem to be all the immunities which can be justly claimed by one portion of society from another, under a government of constitutional limitation.

The act in question is in intention and effect a discrimination in favor of one religious profession over all others, and as such is in violation of the Constitution.

*Per Burnett, J.*—Our constitutional theory regards all religions, *as such*, as equally entitled to protection, and equally unentitled to preference. When there is no ground or necessity upon which a principle can rest but a religious one, then the Constitution steps in and says that it shall not be enforced by authority of law.

The Sunday law violates this provision of the Constitution, because it establishes a compulsory religious observance. It violates as much the religious freedom of the Christian as of the Jew. The principle is the same, whether the act *compels* us to do what we wish to do or what we wish not to do.

If the Legislature has the power to establish a day of compulsory rest, it has the right to select the particular day.

The protection of the Constitution extends to every individual or to none. It is the individual that is intended to be protected. Every citizen has the right to vote and worship as he pleases, without having his motives impeached in any tribunal of the State. When the citizen is sought to be compelled by the Legislature to do any affirmative religious act, or to refrain from doing anything because it violates simply a religious principle or observance, the act is unconstitutional.

The constitutional question is a naked question of legislative power, and the inquiry as to the reasons which operated on the minds of members in voting for the measure, is wholly immaterial.

If section first of article first of the Constitution asserts a principle not susceptible of practical application, then it may admit of a question whether any principle asserted in the declaration of rights can be the subject of judicial enforcement. And if such a position be true that the rights of property can not be enforced by the Courts against an act of the Legislature, a power is then conceded which renders the provisions of the other sections wholly inoperative.

The right to possess and protect property is not more clearly protected by the Constitution, than the right to acquire it. The right to acquire is the right to use the proper means to attain the end; and the use of such means, can not be prohibited by the Legislature, except the peace and safety of the State require it.

Free agents must be left free, as to themselves. If they can not be trusted to regulate their own labor, its times, and quantity, it is difficult to trust them to make their own contracts. If the Legislature can prescribe the *days* of rest for them, it would seem that the same power can prescribe the *hours* to work, rest, and eat.

*Per Field, J., dissenting.*—The "Act to provide for the better observance of the Sabbath," is not in conflict with the fourth section of article one of the Constitution, which declares that "the free exercise and enjoyment of religious profession and worship without discrimination or preference, shall for ever be allowed in this State."

The act establishes, as a civil regulation, a day of rest from secular pursuits, and that is its only scope and purpose. It treats of business matters, not religious duties. In limiting its command to secular pursuits it necessarily leaves religious profession and worship free.

It is not the province of the judiciary to pass upon the wisdom and policy of legislation; and when it does so, it usurps a power not conferred by the Constitution.

The object of the act is not to protect those who can rest at their pleasure, but to afford rest to those who need it, and who, from the conditions of society, could not otherwise obtain it.

The title of the act, and the description of the day, will not warrant the conclusion that the intention of the law is to enforce the Sabbath as a religious institution. The terms "Christian Sabbath or Sunday," are used simply to designate the day selected by the Legislature. The same construction would obtain and the same result follow, if any other terms were employed, as "the Lord's day, commonly called Sunday," "the Sabbath day," or "the first day of the week," which are found in similar statutes of other States.

That the law operates with inconvenience to some is no argument against its constitutionality. Such inconvenience is an incident to all general laws.

The title of an act is never held to control the legislative intent. This intent is to be sought in the purview or body of the act; and when the language in this part is clear and unambiguous, no other part can avail to contradict or control it. The title can be resorted to only in cases of ambiguity, and is then of slight value.

Nor is this well-settled rule as to the effect of a title, in any degree changed by the twenty-fifth section of article four of the Constitution, which requires that "every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title." This section is merely directory, and does not nullify laws passed in violation of it.

In determining the question of power in the Legislature to pass the act, the Court can not consider whether that power was wisely or unwisely exercised, or from pure or impure motives.

The act is not in conflict with the first section of article one of the Constitution, which declares that "all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness."

The rights enumerated in this section are to be enjoyed in a constitutional government in subordination to the general laws of the State. This section was never intended to inhibit legislation on the rights enumerated.

The Legislature possesses the power to legislate for the good order, the peace, welfare, and happiness of society. The means by which these ends are to be effected are left to its discretion, but because the discretion may be abused its acts are not for that reason void.

It is to be supposed that the members of the Legislature will exercise some wisdom in its acts. If they do not, the remedy is with the people. Frequent elections by the people furnish the only protection against the abuse of acknowledged legislative power.

The right to acquire property may be regulated for the public good, though thereby the facility of acquisition is lessened.

The judiciary does not possess the right to supervise the exercise of legislative discretion in matters of mere expediency, and the assumption of such right would be usurpation.

The "Act to provide for the better observance of the Sabbath, approved April 10, 1858," is constitutional.

## HABEAS CORPUS.

Newman, the petitioner, was tried, and convicted before a justice of the peace of the city of Sacramento, for a violation of the act of April 10th, 1858, entitled "An Act to provide for the better observance of the Sabbath," and was sentenced to pay a fine of fifty dollars, and the costs of the prosecution—twenty dol-

lars—or, in default of the payment of such fine and costs, to be imprisoned thirty-five days. Failing to pay the fine and costs imposed, he was imprisoned. The petitioner is an Israelite, engaged in the business of selling clothing, at Sacramento. The offence of which he was convicted was the sale of goods on Sunday. Upon his imprisonment, he petitioned this Court for a writ of *habeas corpus,* and prayed that he might be discharged from imprisonment, on the ground of the illegality of the same, by reason of the unconstitutionality of the act.

The writ was issued, and on the return thereof, the petitioner was discharged.

*Heydenfeldt and Welty* for Petitioner.

*Attorney-General and District-Attorney Morrison* for the People.

TERRY, C. J.—The petitioner was tried and convicted before a justice of the peace for a violation of the act of April, 1858, entitled " An Act for the better observance of the Sabbath," and, upon his failure to pay the fine imposed, was imprisoned.

The counsel for petitioner moves his discharge, on the ground that the act under which these proceedings were had is in conflict with the first and fourth sections of the first article of the State Constitution, and therefore void.

The first section declares " all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty ; acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness."

The fourth section declares " the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall for ever be allowed in this State."

The questions which arise in the consideration of the case, are :

1. Does the act of the Legislature make a discrimination or preference favorable to one religious profession, or is it a mere civil rule of conduct ?

2. Has the Legislature the power to enact a municipal regulation which enforces upon the citizen a compulsory abstinence from his ordinary lawful and peaceable avocations for one day in the week ?

There is no expression in the act under consideration which can lead to the conclusion that it was intended as a civil rule, as contradistinguished from a law for the benefit of religion. It is entitled " An Act for the better observance of the Sabbath," and the prohibitions in the body of the act are confined to the " Christian Sabbath."

It is, however, contended, on the authority of some of the decisions of other States, that notwithstanding the pointed language

of the act, it may be construed into a civil rule of action, and that the result would be the same, even if the language were essentially different.

The fault of this argument is that it is opposed to the universally admitted rule which requires a law to be construed according to the intention of the law-maker, and this intention to be gathered from the language of the law, according to its plain and common acceptation.

It is contended that a civil rule requiring the devotion of one-seventh of the time to repose is an absolute necessity, and the want of it has been dilated upon as a great evil to society. But have the Legislature so considered it? Such an assumption is not warranted by anything contained in the Sunday law. On the contrary, the intention which pervades the whole act is to enforce, as a *religious institution*, the observance of a day held sacred by the followers of one faith, and entirely disregarded by all the other denominations within the State. The whole scope of the act is expressive of an intention on the part of the Legislature to require a periodical cessation from ordinary pursuits, not as a civil duty, necessary for the repression of any existing evil, but in furtherance of the interests, and in aid of the devotions of those who profess the Christian religion.

Several authorities, affirming the validity of similar statutes, have been cited from the reports of other States. While we entertain a profound respect for the Courts of our sister States, we do not feel called upon to yield our convictions of right to a blind adherence to precedent; especially when they are, in our opinion, opposed to principle; and the reasoning by which they are endeavored to be supported is by no means satisfactory or convincing. In Bryan *v.* Berry, (6 Cal., 398,) in reference to the decisions of other States, we said, "decided cases are, in some sense, evidence of what the law is. We say in some sense, because it is not so much the decision as it is the reasoning upon which the decision is based, which makes it authority, and requires it to be respected."

It will be unnecessary to examine all the cases cited by the district-attorney. The two leading cases in which the question is more elaborately discussed than in the others, are the cases of Sepect *v.* The Commonwealth, (8 Barr, 313,) and The City Council *v.* Benjamin, (2 Schobart, 508,) decided respectively by the Supreme Courts of Pennsylvania and South Carolina. These decisions are based upon the ground that the statutes requiring the observance of the Christian Sabbath established merely a civil rule, and make no discrimination or preference in favor of any religion. By an examination of these cases, it will be seen that the position taken rests in mere assertion, and that not a single argument is adduced to prove that a preference in favor of the Christian religion is not given by the law. In the case in

8 Barr, the Court said : " It (the law) intermeddles not with the natural and indefeasible right of all men to worship Almighty God according to the dictates of their own consciences; it compels none to attend, erect, or support any place of worship, or to maintain any ministry, against his consent; it pretends not to control or interfere with the rights of conscience, and it establishes no preference for any religious establishment or mode of worship."

This is the substance of the arguments to show that these laws establish no preference. The last clause in the extract asserts the proposition broadly; but it is surely no legitimate conclusion from what precedes it, and must be taken as the plainest example of *petitio principii*. That which precedes it establishes that the law does not destroy religious toleration, but that is all.

Now, does our Constitution, when it forbids discrimination or preference in religion, mean merely to guaranty toleration? For that, in effect, is all which the cases cited seem to award, as the right of a citizen. In a community composed of persons of various religious denominations, having different days of worship, each considering his own as sacred from secular employment, all being equally considered and protected under the Constitution, a law is passed which in effect recognizes the sacred character of one of these days, by compelling all others to abstain from secular employment, which is precisely one of the modes in which its observance is manifested and required by the creed of that sect to which it belongs as a Sabbath. Is not this a discrimination in favor of the one? Does it require more than an appeal to one's common sense to decide that this is a preference? And when the Jew, or Seventh-Day Christian complains of this, is it any answer to say, your conscience is not constrained, you are not compelled to worship or to perform religious rites on that day, nor forbidden to keep holy the day which you esteem as a Sabbath? We think not, however high the authority which decides otherwise.

When our liberties were acquired, our republican form of government adopted, and our Constitution framed, we deemed that we had attained not only toleration, but religious liberty in its largest sense—a complete separation between Church and State, and a perfect equality without distinction between all religious sects. " Our Government," said Mr. Johnson, in his celebrated Sunday-mail report, " is a civil and not a religious institution; whatever may be the religious sentiments of citizens, and however variant, they are alike entitled to protection from the government, so long as they do not invade the rights of others." And again, dwelling upon the danger of applying the powers of government to the furtherance and support of sectarian objects, he remarks, in language which should not be forgotten, but which ought to be deeply impressed on the minds of all who

desire to maintain the supremacy of our republican system: "Extensive religious combinations to effect a political object, were, in the opinion of the committee, always dangerous. The first effort of the kind calls for the establishment of a principle which would lay the foundation for dangerous innovation upon the spirit of the Constitution, and upon the religious rights of the citizen. If admitted, it may be justly apprehended that the future measures of the Government will be strangely marked, if not eventually controlled by the same influence. All religious despotism commences by combination and influence, and when that influence begins to operate upon the political institution of a country, the civil power soon bends under it, and the catastrophe of other nations furnishes an awful warning of the consequences. * * * What other nations call religious toleration, we call religious rights; they were not exercised in virtue of governmental indulgence, but as rights of which the government cannot deprive any portion of her citizens, however small. Despotic power may invade those rights, but justice still confirms them. Let the National Legislature once perform an act which involves the decision of a religious controversy, and it will have passed its legitimate bounds. The precedent will then be established, and the foundation laid for that usurpation of the divine prerogative in this country, which has been the desolating scourge of the fairest portions of the old world. Our Constitution recognizes no other power than that of persuasion for enforcing religious observances."

We come next to the question whether, considering the Sunday law as a civil regulation, it is in the power of the Legislature to enforce a compulsory abstinence from lawful and ordinary occupation for a given period of time, without some apparent civil necessity for such action; whether a pursuit, which is not only peaceable and lawful, but also praiseworthy and commendable, for six days in the week, can be arbitrarily converted into a penal offence or misdemeanor on the seventh. As a general rule, it will be admitted that men have a natural right to do anything which their inclinations may suggest, if it be not evil in itself, and in no way impairs the rights of others. When societies are formed, each individual surrenders certain rights, and as an equivalent for that surrender has secured to him the enjoyment of certain others appertaining to his person and property, without the protection of which society cannot exist. All legislation is a restraint on individuals, but it is a restraint which must be submitted to by all who would enjoy the benefits derived from the institutions of society.

It is necessary, for the preservation of free institutions, that there should be some general and easily recognized rule, to determine the extent of governmental power, and establish a proper line of demarkation between such as are strictly legitimate and

such as are usurpations which invade the reserved rights of the citizen and infringe upon his constitutional liberty. The true rule of distinction would seem to be that which allows to the Legislature the right so to restrain each one, in his freedom of conduct, as to secure perfect protection to all others from every species of danger to person, health, and property; that each individual shall be required so to use his own as not to inflict injury upon his neighbor, and these, we think, are all the immunities which can be justly claimed by one portion of society from another, under a government of constitutional limitation. For these reasons, the law restrains the establishment of tanneries, slaughter-houses, gunpowder depots, the discharge of fire-arms, etc., in a city, the sale of drugs and poisons, and the practice of physic by incompetent persons, and makes a variety of other prohibitions, the reason and sense of which are obvious to the most common understanding.

Now, when we come to inquire what reason can be given for the claim of power to enact a Sunday law, we are told, looking at it in its purely civil aspect, that it is absolutely necessary for the benefit of his health and the restoration of his powers, and in aid of this great social necessity, the Legislature may, for the general convenience, set apart a particular day of rest, and require its observance by all.

This argument is founded on the assumption that mankind are in the habit of working too much, and thereby entailing evil upon society, and that without compulsion they will not seek the necessary repose which their exhausted natures demand. This is to us a new theory, and is contradicted by the history of the past and the observations of the present. We have heard, in all ages, of declamations and reproaches against the vice of indolence, but we have yet to learn that there has ever been any general complaint of an intemperate, vicious, unhealthy or morbid industry. On the contrary, we know that mankind seek cessation from toil from the natural influences of self-preservation, in the same manner and as certainly as they seek slumber, relief from pain, or food to appease their hunger.

Again, it may be well considered, that the amount of rest which would be required by one-half of society may be widely disproportionate to that required by the other. It is a matter of which each individual must be permitted to judge for himself, according to his own instincts and necessities. As well might the Legislature fix the days and hours for work, and enforce their observance by an unbending rule which shall be visited alike upon the weak and strong. Whenever such attempts are made, the law-making power leaves its legitimate sphere, and makes an incursion into the realms of physiology, and its enactments, like the sumptuary laws of the ancients, which prescribe the mode and texture of people's clothing, or similar laws which

might ꞵꞷ ꞷcribe and limⁱ ꞷ ꞷ food and drink, must be regarded as an invasion, without reason or necessity, of the natural rights of the citizen, which are guaranteed by the fundamental law.

The truth is, however much it may be disguised, that this one day of rest is a purely religious idea. Derived from the Sabbatical institutions of the ancient Hebrew, it has been adopted into all the creeds of succeeding religious sects throughout the civilized world; and whether it be the Friday of the Mohammedan, the Saturday of the Israelite, or the Sunday of the Christian, it is alike fixed in the affections of its followers, beyond the power of eradication, and in most of the States of our Confederacy, the aid of the law to enforce its observance has been given, under the pretence of a civil, municipal, or police regulation.

But it has been argued that this is a question exclusively for the Legislature; that the law-making power alone has the right to judge of the necessity and character of all police rules, and that there is no power in the judiciary to interfere with the exercise of this right.

One of the objects for which the judicial department is established is the protection of the constitutional rights of the citizen. The question presented in this case is not merely one of expediency or abuse of power; it is a question of usurpation of power. If the Legislature have the authority to appoint a time of compulsory rest, we would have no right to interfere with it, even if they required a cessation from toil for six days in the week instead of one. If they possess this power, it is without limit, and may extend to the prohibition of all occupations at all times.

While we concede to the Legislature all the supremacy to which it is entitled, we can not yield to it the omnipotence which has been ascribed to the British Parliament, so long as we have a Constitution which limits its powers, and places certain innate rights of the citizen beyond its control.

It is said that the first section of article first of the Constitution is a common-place assertion of a general principle, and was not intended as a restriction upon the power of the Legislature. This Court has not so considered it.

In Billings v. Hall, (7 Cal., 1,) Chief Justice Murray says, in reference to this section of the Constitution: " This principle is as old as the Magna Charta. It lies at the foundation of every constitutional government, and is necessary to the existence of civil liberty and free institutions. It was not lightly incorporated into the Constitution of this State, as one of those political dogmas designed to tickle the popular ear, and conveying no substantial meaning or idea, but as one of those fundamental principles of enlightened government, without a rigorous observance of which there could be neither liberty nor safety to the citizen."

In the same case, Mr. Justice Burnett asserted the following
33

principles, which bear directly upon the question : "That among the inalienable rights declared by our Constitution as belonging to each citizen, is a right of 'acquiring, possessing, and protecting property.' * * 'That for the Constitution to declare a right inalienable, and at the same time leave the Legislature unlimited power over it, would be a contradiction in terms, an idle provision, proving that a Constitution was a mere parchment barrier, insufficient to protect the citizen, delusive and visionary, and the practical result of which would be to destroy, not conserve the rights it vainly assumed to protect.'"

Upon this point, I dissent from the opinion of the Court in Billings v. Hall, and if I considered the question an open one, I might yet doubt its correctness, but the doctrine announced in that opinion having received the sanction of the majority of the Court, has become the rule of decision, and it is the duty of the Court to see it is uniformly enforced, and that its application is not confined to a particular class of cases.

It is the settled doctrine of this Court to enforce every provision of the Constitution in favor of the rights reserved to the citizen against a usurpation of power in any question whatsoever, and although in a doubtful case, we would yield to the authority of the Legislature, yet upon the question before us, we are constrained to declare that, in our opinion, the act in question is in conflict with the first section of article first of the Constitution, because, without necessity, it infringes upon the liberty of the citizen, by restraining his right to acquire property.

And that it is in conflict with the fourth section of the same article, because it was intended as, and is in effect, a discrimination in favor of one religious profession, and gives it a preference over all others.

It follows that the petitioner was improperly convicted, and it is ordered that he be discharged from custody.

BURNETT, J.—The great importance of the constitutional principle involved, and the different view I take of some points, make it proper for me to submit a separate opinion. The question is one of no ordinary magnitude, and of great intrinsic difficulty. The embarrassment we might otherwise experience in deciding a question of such interest to the community, and in reference to which there exists so great a difference of opinion, is increased by the consideration that the weight of the adjudged cases is against the conclusion at which we have been compelled to arrive.

In considering this constitutional question it must be conceded that there are some great leading principles of justice, eternal and unchangeable, that are applicable at all times and under all circumstances. It is upon this basis that all Constitutions of

free government must rest. A Constitution that admits that there are *any inalienable* rights of human nature reserved to the individual, and not ceded to society, must, of logical necessity, concede the truth of this position. But it is equally true, that there are *other* principles, the application of which may be justly modified by circumstances.

It would seem to be true, that exact justice is only an exact conformity to some *law.* Without law there could be neither merit or demerit, justice or injustice; and when we come to decide the question, whether a given act be just or injust, we must keep in our view that system of law by which we judge it. As judged by one code of law, the act may be innocent; while as judged by another, it may be criminal. As judged by the system of abstract justice (which is only that code of law which springs from the natural relation and fitness of -things,) there must be certain inherent and inalienable rights of human nature that no government can rightfully take away. These rights are retained by the individual because their surrender is not required by the good of the whole. The just and legitimate ends of civil government can be practically and efficiently accomplished whilst these rights are retained by the individual. Every person, upon entering into a state of society, only surrenders so much of his individual rights as may be necessary to secure the substantial happiness of the community. Whatever is not necessary to attain this end is reserved to himself.

But, conceding the entire correctness of these views, it must be equally clear that the original and primary jurisdiction to determine the question *what are these inalienable rights,* must exist somewhere; and wherever placed, its exercise must be conclusive, in the contemplation of the theory, upon all.

The power to decide what individual right must be conceded to society, originally existed in the sovereign people who made the Constitution. As they possessed this primary and original jurisdiction, their action must be final. If they exercised this power, in whole or in part, in the formation of the Constitution, their action, *so far,* is conclusive.

It must also be conceded that this power, from its very nature, must be legislative and not judicial. The question is simply one of necessity—of abstract justice. It is a question that naturally enters into the mind of the law-maker, not into that of the law-expounder. The judicial power, from the nature of its functions, can not determine such a question. Judicial justice is but conformity to the law *as already made.*

If these views be correct, the judicial department can not, *in any case,* go behind the Constitution, and by any *original* standard judge the justice or legality of any single one or more of its provisions. The judiciary is but the creature of the Constitution, and can not judge its creator. It can not rise above the

source of its own existence. If it could do this, it could annul the Constitution, instead of simply declaring what it means. And the same may be said of any act of the Legislature, if within the limits of its discretion, *as defined* by the Constitution. Such an act of the Legislature is as much beyond the reach of the judiciary as is the Constitution itself. (1 Bald. R., 74; 1 Brock. R., 334; 10 Peters, 478; 5 Geo. R., 194.)

But it is the right and the imperative duty of this Court to construe the Constitution and statutes, in the last resort; and, from that construction, to ascertain the will of the law-maker. And the only legitimate purpose for which a Court can resort to the principles of abstract justice, is to ascertain the proper construction of the law in cases of doubt. When, in the opinion of the Court, a given construction is clearly contrary to the manifest principles of justice, then it will be presumed, in a case not free from doubt, that the Legislature never intended such a consequence. (Varick *v.* Briggs, 6 Paige, 330; Flint River Steamboat Company *v.* Foster, 5 Geo. R., 194.) But when the intention is clear, however unjust and absurd the consequences may be, it must prevail, unless it contravenes a constitutional provision.

If these views be correct, it follows that there can be for this Court no higher law than the Constitution; and in determining this question of constitutional construction, we must forget, as far as in us lies, that we are religious or irreligious men. It is solely a matter of construction, with which our individual feelings, prejudices, or opinions upon abstract questions of justice, can have nothing to do. The Constitution may have been unwisely framed. It may have given too much or too little power to the Legislature. But these are questions for the statesman, not for the jurist. Courts are bound by the law as it is.

The British Constitution differs from our American Constitutions in one great leading feature. It only classifies and distributes, but does not *limit* the powers of government; while our Constitutions do *both*. It is believed that this difference has been sometimes overlooked by our Courts, in considering constitutional questions; and English authorities followed in cases to which they could not properly be applied. We often meet with the expression that Christianity is a part of the common law. Conceding that this is true, it is not perceived how it can influence the decision of a constitutional question. The Constitution of this State will not tolerate any discrimination or preference in favor of any religion; and, so far as the common law conflicts with this provision, it must yield to the Constitution. Our constitutional theory regards all religions, *as such,* equally entitled to protection, and all equally unentitled to any preference. Before the Constitution they are all equal. In so far as the principles found in all, or in any one or more of the different

religious systems, are considered applicable to the ends legiti-
mately contemplated by civil constitutional government, they
can be embodied in our laws, and enforced. But when there
is no ground or necessity upon which a principle can rest but
a religious one, then the Constitution steps in and says that
you *shall not enforce it by authority of law.*

The Constitution says, that "the free exercise and enjoyment
of religious profession and worship, without discrimination or
preference, shall for ever be allowed in this State."

If we give this language a mere literal construction, we must
conclude that the protection given is only intended for the pro-
fessor, and not for him who does not worship. "The free exer-
cise and enjoyment of religious profession and worship," is the
thing expressly protected by the Constitution. But taking the
whole section together, it is clear that the scope and purpose of
the Constitution was to assert the great, broad principle of reli-
gious freedom for all—for the believer and the unbeliever. The
government has no more power to punish a citizen when he pro-
fesses no religion, than it has to punish him when he professes
any particular religion.

The act of the Legislature under consideration violates this
section of the Constitution, because it establishes a compulsory
religious observance; and not, as I conceive, because it makes a
discrimination between different systems of religion. If it be
true, that the Constitution intended to secure entire religious
freedom to all, without regard to the fact whether they were
believers or unbelievers, then it follows that the Legislature
could not create and enforce any merely religious observance
whatever. It was the purpose of the Constitution to establish a
*permanent* principle, applicable at all times, under all circum-
stances, and to all persons. If all the people of the State had
been unbelievers, the act would have been subject to the same
objection. So, if they had all been Christians, the power of the
Legislature to pass the act would equally have been wanting.
The will of the whole people has been expressed through the
Constitution; and until this expression of their will has been
changed in some authoritative form, it must prevail with all the
departments of the State government. The Constitution, from
its very nature as a permanent organic act, could not shape its
provisions so as to meet the changing views of individuals. Had
the act made Monday, instead of Sunday, a day of compulsory
rest, the constitutional question would have been the same. The
fact that the Christian *voluntarily* keeps holy the first day of the
week, does not authorize the Legislature to make that observ-
ance *compulsory.* The Legislature can not compel the citizen to
do that which the Constitution leaves him free to do or omit, at
his election. The act violates as much the religious freedom of
the Christian as of the Jew. Because the conscientious views of

the Christian compel him to keep Sunday as a Sabbath, he has the right to object, when the Legislature invades his freedom of religious worship, and assumes the power to compel him to do that which he has the right to omit if he pleases. The principle is the same, whether the act of the Legislature *compels* us to do that which we wish to do, or not to do.

The *compulsory* power does not exist in either case. If the Legislature has power over the subject, this power exists without regard to the particular views of individuals. The sole inquiry with us is, whether the Legislature can create a day of compulsory rest. If the Legislature has the power, then it has the right to select the particular day. It could not well do otherwise.

The protection of the Constitution extends to *every* individual or to none. It is the individual that is intended to be protected. The principle is the same, whether the many or the few are concerned. The Constitution did not mean to inquire how many or how few would profess or not profess this or that particular religion. If there be but a single individual in the State who professes a particular faith, he is as much within the sacred protection of the Constitution as if he agreed with the great majority of his fellow-citizens. We can not, therefore, inquire into the particular views of the petitioner, or of any other individual. We are not bound to take judicial notice of such matters, and they are not matters of proof. There may be individuals in the State that hold Monday as a Sabbath. If there be none such now, there may be in the future. And, if the unconstitutionality of an act of this character depended, in any manner, upon the fact that a particular day of the week was selected, then it follows, that any individual could defeat the act by professing to hold the day specified as his Sabbath. The Constitution protects the freedom of religious *profession* and *worship*, without regard to the sincerity or insincerity of the worshipper. We could not inquire into the fact, whether the individual professing to hold a particular day as his Sabbath was sincere or otherwise. He has the right to profess and worship as he pleases, without having his motives inquired into. His motives in exercising a constitutional privilege are matters too sacred to be submitted to judicial scrutiny. Every citizen has the undoubted right to vote and worship as he pleases, without having his motives impeached in any tribunal of the State.

Under the Constitution of this State, the Legislature can not pass any act, the legitimate effect of which is *forcibly* to establish any merely religious truth, or enforce any merely religious observances. The Legislature has no power over such a subject. When, therefore, the citizen is sought to be compelled by the Legislature to do any affirmative religious act, or to refrain from

doing anything, because it violates simply a religious principle or observance, the act is unconstitutional.

In considering the question whether the act can be sustained, upon the ground that it is a mere municipal regulation, the inquiry as to the reasons which operated upon the minds of members, in voting for the measure, is, as I conceive, wholly immaterial. The constitutional question is a naked question of legislative power. Had the Legislature the power to do the particular thing done ? What was that particular thing ? It was the prohibition of labor on Sunday. Had the act been so framed as to show that it was intended by those who voted for it, as simply a municipal regulation ; yet, if, in fact, it contravened the provision of the Constitution securing religious freedom to all, we should have been compelled to declare it unconstitutional for *that* reason. So, the fact that the act is so framed as to show that a different reason operated upon the minds of those who voted for it, will not prevent us from sustaining the act, if any portion of the Constitution conferred the power to pass it upon the Legislature.

Where the power exists to do a particular thing, and the thing is done, the reason which induced the act is not to be inquired into by the Courts. The power may be abused ; but the abuse of the power can not be avoided by the judiciary. A Court may give a wrong reason for a proper judgment; still, the judgment must stand. The members of the Legislature may vote for a particular measure from erroneous or improper motives. The only question with the Courts is, whether that body had the power to command the particular act to be done or omitted. The view here advanced, is sustained substantially by the decision in the case of Fletcher *v.* Peck, (6 Cranch, 131.)

It was urged, in argument, that the provision of the first section of the first article of the Constitution, asserting the "inalienable right of acquiring, possessing, and protecting property," was only the statement in general terms, on a general principle, not capable in its nature of being judicially enforced.

It will be observed that the first article contains a declaration of rights, and if the first section of that article asserts a principle not susceptible of practical application, then it may admit of a question whether any principle asserted in this declaration of rights can be the subject of judicial enforcement. But that at least a portion of the general principles asserted in that article can be enforced by judicial determination, must be conceded. This has been held at all times, by all the Courts, so far as I am informed.

The provisions of the sixteenth section of the first article, which prohibits the Legislature from passing any law impairing the obligation of contracts, is based essentially upon the same ground as the first section, which asserts the right to acquire,

possess, and defend property. The right substantially secured by both sections is the right of property. This right of property is the substantial basis upon which the provisions of both sections must rest. The reason of, and the end to be accomplished by, each section, are the same. The debtor has received property or other valuable considerati᷈ ᷈ for the sum he owes the creditor, and the sum, when col᷈    ᷈d by the creditor, becomes his property. The right of the  reditor to collect from the debtor that which is due, is essen᷈ ᷈ally a right of property. It is the right to obtain from the debtor property which is unjustly detained from the creditor.

If we take the position to be true, for the sake of the argument, that the right of property can not be enforced by the Courts against an act of the Legislature, we then concede a power that renders the restrictions of other sections inoperative. For example, if the Legislature has the power to take the property of one citizen, and give it to another without compensation, the prohibition to pass any law impairing the obligation of contracts, could readily be avoided. All the Legislature would have to do to accomplish this purpose, would be to allow the creditor first to collect his debt, and afterwards take the property of the creditor, and give it to the debtor. For if we once concede the power of the Legislature to take the property of A and give it to B, without compensation, we must concede to that body the exclusive right to judge when, and in what instances, this conceded right should be exercised.

It was also insisted, in argument, that the judicial enforcement of the right of property, as asserted in the first section, is inconsistent with the power of compulsory process, to enforce the collection of debts by the seizure and sale of the property of the debtor. But is this true? On the contrary, is not the power to seize and sell the property of the debtor expressly given by the Constitution for the very purpose of protecting and enforcing this right of property? When the Constitution says that you shall not impair the obligation of the contract, it says *in direct effect* that you shall enforce it; and the only means to do this efficiently is by a seizure and sale. The seizure and sale of the property of the debtor was contemplated by the Constitution, as being a part of the contract itself. The debtor stipulates in the contract, that, in case he fails to pay, the creditor may seize and sell his property by legal process. Such is the legal effect of the contract, because the existing law enters into and forms a part of it.

The different provisions of the Constitution will be found, when fairly and justly considered, to be harmonious and mutually dependent one upon the other. A general principle may be asserted in one section without any specification of the exceptions in that place. But it must be evident that practical

convenience and logical arrangement will not always permit the exceptions to be stated in the same section. It is matter of no importance in what part of the Constitution the exception may be found. Wherever found, it must be taken from the general rule, leaving the remainder of the rule to stand. The general right of enjoying and defending life and liberty is asserted in the first section of the first article; while the exceptions are stated in the eighth, ninth, fifteenth, and eighteenth sections of the same article. A party may, by express provisions of the Constitution, forfeit his liberty. The same remark, in reference to exceptions to general principles, will apply to other provisions.

The right to protect and possess property is not more clearly protected by the Constitution than the right to acquire. The right to acquire must include the right to use the proper means to attain the end. The right itself would be impotent without the power to use its necessary incidents. The Legislature, therefore, can not prohibit the proper use of the means of acquiring property, except the peace and safety of the State require it. And in reference to this point, I adopt the reasons given by the Chief Justice, and concur in the views expressed by him.

There are certain classes of subjects over which the Legislature possesses a wide discretion; but still this discretion is confined within certain limits; and although, from the complex nature of the subject, these limits cannot always be definitely settled in advance, they do and must exist. It was long held, in general terms, that the Legislature had the power to regulate the remedy; but cases soon arose where the Courts were compelled to interpose. In the case of Bronson v. Kenzie, (1 How. U. S. R., 311,) Chief Justice Taney uses this clear language:

" It is difficult, perhaps, to draw a line that would be applicable in all cases, between legitimate alterations of the remedy and provisions which in the form of remedy impair the right; but it is manifest that the obligation of the contract may, in effect, be destroyed by denying a remedy altogether; or may be seriously impaired by hampering the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing."

So, the power of the Legislature to pass Recording Acts and Statutes of Limitations is conceded, in general terms, and a wide discretion given. Yet, in reference to these powers, Mr. Justice Baldwin, in delivering the opinion of the Supreme Court of the United States, in the case of Jackson v. Lamphine (3 Peters, 289,) uses this language:

" Cases may occur where the provisions of a law on these subjects may be so unreasonable as to amount to a denial of the right and call for the interposition of the Court."

The Legislature is vested by the Constitution with a wide dis-

cretion in determi⸱⸱⸱    ⸱⸱⸱ is necessary to the peace and safety
of the State; yet this discretion has some limits. It may be
difficult, in many cases, to define these limits with exact precis-
ion; but this difficulty can not show that there are no limits.
Such difficulties must arise under every system of limited gov-
ernment.

The question arising under this act is quite distinguishable
from the case where the Legislature of a State in which slavery
is tolerated, passes an act for the protection of the slave against
the inhumanity of the master in not allowing sufficient rest. In
this State, every man is a free agent, competent and able to pro-
tect himself, and no one is bound by law to labor for any parti-
cular person. Free agents must be left free, as to *themselves*.
Had the act under consideration been confined to infants or per-
sons bound by law to obey others, then the question presented
would have been very different. But if we can not trust free
agents to regulate their own labor, its times and quantity, it is
difficult to trust them to make their own contracts. If the Le-
gislature could prescribe the *days* of rest for them, then it would
seem that the same power could prescribe the hours to work,
rest, and eat.

For these reasons, I concur with the Chief Justice in discharg-
ing the petitioner.

FIELD, J.—After a careful and repeated perusal of the opinions
of my associates, I am unable to concur either in their reasoning
or in their judgment. I can not perceive any valid ground for
declaring the Act of 1858, for the better observance of the Sab-
bath, unconstitutional. In ordinary cases, I should be content
with refraining from a concurrence, or expressing a simple dis-
sent, but, in the present case, I feel compelled to state the rea-
sons of my dissent, as the opinions of my associates appear to
me to assert a power in the judiciary never contemplated by
the Constitution, and of dangerous consequences; and to adopt
a construction of constitutional provisions, which must deprive
the Legislature of all control over a great variety of subjects,
upon which its right to legislate, in the promotion of the public
weal, has never been doubted.

The enactment in question is held to conflict with the first and
fourth sections of the first article of the Constitution.

The first section declares that "all men are by nature free and
independent, and have certain inalienable rights, among which
are those of enjoying and defending life and liberty; acquiring,
possessing, and protecting property; and pursuing and obtaining
safety and happiness."

The fourth section declares that "the free exercise and enjoy-
ment of religious profession and worship, without discrimination
or preference, shall for ever be allowed in this State."

In examining the questions raised by the petitioner, I will first consider the fourth section, and whether the statute is in any sense within its provisions. The statute is prohibitory in its character, and its constitutionality must be determined by the acts it forbids. The inquiry is as to the power of the Legislature, not as to the motives which induced the enactment. That power is exhibited in the clause which provides that no person shall, on the Christian Sabbath, or Sunday, keep open any store, warehouse, mechanic-shop, work-shop, banking-house, manufacturing establishment, or other business house, for business purposes; or sell, or expose for sale, any goods, wares, or merchandise on that day, and fixes the penalty for the violation of the provision. If the exercise of this power is not prohibited to the Legislature by the Constitution, either in express terms, or by necessary implication, it is our duty to uphold the statute. Of its wisdom or policy, it is not within our province to judge. In what manner it conflicts with the fourth section I am unable to perceive. What have the sale of merchandise, the construction of machines, the discount of notes, the drawing of bills of exchange, the purchase of gold, or the business of the artisan, mechanic, or manufacturer, to do with religious profession or worship? There is no necessary connection between them. The petitioner is an Israelite, engaged in the sale of clothing, and his complaint is, not that his religious profession or worship is interfered with, but that he is not permitted to dispose of his goods on Sunday; not that any religious observance is imposed upon him, but that his secular business is closed on a day on which he does not think proper to rest. In other words, the law, as a civil regulation, by the generality of its provisions, interrupts his acquisitions on a day which does not suit him. The law treats of business matters, not religious duties. In fixing a day of rest, it establishes only a rule of civil conduct. In limiting its command to secular pursuits, it necessarily leaves religious profession and worship free. It is absurd to say that the sale of clothing, or other goods, on Sunday, is an act of religion or worship; and it follows that the inhibition of such sale does not interfere with either. Religious profession springs from matters of faith, and religious worship is the adoration of the soul. As to the forms in which that profession or worship shall be exhibited, the law is silent; it utters no command, and it imposes no restraint. It makes no discrimination or preference between the Hebrew and Gentile, the Mussulman and Pagan, the Christian and Infidel, but leaves to all the privilege of worshipping God, or of denying His existence, according to the conclusions of their own judgments, or the dictates of their own consciences. *It does not even allude to the subject of religious profession or worship, in any of its provisions.* It establishes, as a civil regulation, a day of rest from secular pursuits, and that is its only scope and purpose. Its requirement is a cessa-

tion from labor.  In its enactment, the Legislature has given the sanction of law to a rule of conduct, which the entire civilized world recognizes as essential to the physical and moral well-being of society.  Upon no subject is there such a concurrence of opinion, among philosophers, moralists, and statesmen of all nations, as on the necessity of periodical cessations from labor. One day in seven is the rule, founded in experience, and sustained by science.  There is no nation, possessing any degree of civilization, where the rule is not observed, either from the sanctions of the law, or the sanctions of religion.  This fact has not escaped the observation of men of science, and distinguished philosophers have not hesitated to pronounce the rule founded upon a law of our race.

The Legislature possesses the undoubted right to pass laws for the preservation of health and the promotion of good morals, and if it is of opinion that periodical cessation from labor will tend to both, and thinks proper to carry its opinion into a statutory enactment on the subject, there is no power, outside of its constituents, which can sit in judgment upon its action.  It is not for the judiciary to assume a wisdom which it denies to the Legislature, and exercise a supervision over the discretion of the latter.  It is not the province of the judiciary to pass upon the wisdom and policy of legislation; and when it does so, it usurps a power never conferred by the Constitution.

It is no answer to the requirements of the statute to say that mankind will seek cessation from labor by the natural influences of self-preservation.  The position assumes that all men are independent, and at liberty to work whenever they choose.  Whether this be true or not in theory, it is false in fact; it is contradicted by every day's experience.  The relations of superior and subordinate, master and servant, principal and clerk, always have and always will exist.  Labor is in a great degree dependent upon capital, and unless the exercise of the power which capital affords is restrained, those who are obliged to labor will not possess the freedom for rest which they would otherwise exercise.  The necessities for food and raiment are imperious, and the exactions of avarice are not easily satisfied.  It is idle to talk of a man's freedom to rest when his wife and children are looking to his daily labor for their daily support.  The law steps in to restrain the power of capital.  Its object is not to protect those who can rest at their pleasure, but to afford rest to those who need it, and who, from the conditions of society, could not otherwise obtain it.  Its aim is to prevent the physical and moral debility which springs from uninterrupted labor; and in this aspect it is a beneficent and merciful law.  It gives one day to the poor and dependent; from the enjoyment of which no capital or power is permitted to deprive them.  It is theirs for repose, for social intercourse, for moral culture, and, if they choose, for divine

worship. Authority for the enactment I find in the great object of all government, which is protection. Labor is a necessity imposed by the condition of our race, and to protect labor is the highest office of our laws.

But is urged that the intention of the law is to enforce the Sabbath as a religious institution. This position is assumed from the description of the day and the title of the act, but is not warranted by either. The terms "Christian Sabbath or Sunday," are used simply to designate the day selected by the Legislature. The same construction would obtain and the same result follow if any other terms were employed, as "the Lord's day, commonly called Sunday," contained in the statute of Pennsylvania, or simply "the Sabbath day," or "the first day of the week," as in several statutes. The power of selection being in the Legislature, there is no valid reason why Sunday should not be designated as well as any other day. Probably no day in the week could be taken which would not be subject to some objection. That the law operates with inconvenience to some is no argument against its constitutionality. Such inconvenience is an incident to all general laws. A civil regulation can not be converted into a religious institution because it is enforced on a day which a particular religious sect regards as sacred. The Legislature has seen fit, in different enactments, to prohibit judicial and various kinds of official business on Sunday, and yet it has never been contended that these enactments establish any religious observances, or that the compulsory abstinence from judicial or official labor is a discrimination or preference in favor of any religious sect. The law requires notes, when the last day of grace falls on Sunday, to be presented to the maker on Saturday, in order to hold the endorser. Would the complaint of an Israelite, that this was a discrimination in an important class of contracts in favor of the Christian, be listened to for a moment? But why not? In the course of his business it often becomes important to his interest that he should take commercial paper, not given to him in the first instance, and when, therefore, it is not in his power to fix the day of payment; and if the opinion of my associates is law, I see no reason why he should be compelled to have the note presented on Saturday, in order to hold the endorser. And why should he be denied the power of enforcing on that day, by legal process, contracts entered into with him? To be consistent, we ought to hold all this legislation as discriminating and giving a preference in favor of one religious sect, and therefore unconstitutional. The answer consists in the simple fact that the legislation is not based upon any idea of enforcing a religious observance, but of establishing, as a civil regulation, a day of rest from judicial and other official labor; and the Constitution itself contains a recognition of Sunday as a day of rest, in the clause which provides that a bill presented to

the Governor shall become a law in like manner as if he had signed it, if not returned by him within ten days, *Sundays excepted*, unless the Legislature, by adjournment, prevent such return. The word *Sundays*, in the plural, is in the Constitution on file in the office of the Secretary of State, not *Sunday*, in the singular, as found in the printed copy. (Price *v.* Whitman, 8 Cal., 412; Const., Art. 4, § 17.)

The fact that the civil regulation finds support in the religious opinions of a vast majority of the people of California is no argument against its establishment. It would be fortunate for society if all wise civil rules obtained a ready obedience from the citizen, not merely from the requirements of the law, but from conscientious or religious convictions of their obligation. The law against homicide is not the less wise and necessary because the Divine command is, "thou shalt do no murder." The legislation against perjury is not the less useful and essential for the due administration of justice because the injunction comes from the Most High, "thou shalt not bear false witness against thy neighbor." The establishment by law of Sunday as a day of rest from labor, is none the less a beneficent and humane regulation, because it accords with the Divine precept that upon that day "thou shalt do no manner of work; thou, and thy son, and thy daughter, thy man-servant and thy maid-servant, thy cattle, and the stranger that is within thy gates."

The title of an act is never held to control the legislative intent. Originally it was considered as constituting no part of the act, "no more," says Lord Holt, "than the title of a book is part of a book." (Wills *v.* Wilkins, 6 Mod., 62; Rex. *v.* Williams, 1 W. Bl., 85; 3 R., 33—Poulter's case.) It was usually framed by the clerk of the House in which the bill first passed, or by the Judges after the receipt of the King's answer to the petition of the Commons, and was intended only as a convenient mode of reference. At the present day it is seldom the subject of legislative discussion, and is evidence of little more than that the originator of the act saw fit to designate it by the particular name. (Att'y Gen. *v.* Lord Weymouth, 1 Ambler, 22.) The legislative intent is to be sought in the purview or body of the act, and where the language in this part is clear and unambiguous, no other part can avail to contradict or control it. The title can be resorted to only in cases of ambiguity, and is then of slight value. "It can only be used," says Sedgwick on Statutes, "for the fact of the makers having given a law a certain name, if that fact can render any assistance in doubtful cases." Nor is the well-settled rule as to the effect of a title in any degree changed by the twenty-fifth section of article four of the Constitution, which requires that "every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title." This section is merely directory; it does not nullify laws passed

in violation of it. This was expressly held by this Court in Washington *v.* Page, (4 Cal., 388.) The opinion in that case was delivered by the late Chief Justice Murray, and concurred in by Mr. Justice Heydenfeldt. In it they say: "We regard this section of the Constitution as merely directory; and, if we were inclined to a different opinion, would be careful how we lent ourselves to a construction which must, in effect, obliterate almost every law from the statute book, unhinge the business, and destroy the labor of the last three years.

"The first Legislature that met under the Constitution seems to have considered this section as directory, and almost every act of that and the subsequent sessions would be obnoxious to this objection. * * With the policy or wisdom of the act we have nothing to do; it is simply our duty to determine its legality."

The law in question is free from all ambiguity. Its purview, or body, speaks a command which no one can mistake. Its title, therefore, is not a subject for consideration. The law would be equally obligatory if entitled "An Act to promote the general health." The section of the Constitution being directory in its character, can operate only on the conscience of the law-maker. Like the provision that the laws shall be published in Spanish, it creates a duty of imperfect obligation, which the judiciary can not enforce.

But, aside from these views, there is nothing in the title of the act open to criticism. It reads, "An Act to provide for the better observance of the Sabbath," which means nothing more or less than an act to provide for the better observance of a day of the week called the Sabbath. It does not indicate the manner of observance; that is exhibited in the body of the act. It is there commanded to be by cessation from labor, not by religious worship.

With the motives which operated upon the Legislature to pass the act, we have nothing to do. They may have been as varied as the different minds of its members. With some, religious convictions may have controlled; with others, a sense of the necessity of protecting labor; with some, a belief that it would be a popular law with their constituents; and with others, less worthy considerations. It is a question of power that we are determining, and whether that power was wisely or unwisely exercised, or from pure or impure motives, is of no moment. If we admit that the law had its origin in the religious opinions of the members of the Legislature, we advance nothing in favor of its constitutionality, and concede nothing against it. It would be, indeed, singular if a wise and beneficent law were the subject of objection, because suggested by the principles of a pure religion. Christianity is the prevailing faith of our people; it is the basis of our civilization; and that its spirit should infuse itself into

and humanize our laws, is as natural as that the national senti-
ment of liberty should find expression in the legislation of the
country.

The question as to the validity of a Sunday law, resembling in
its general features the one under consideration, has frequently
been before the highest Courts of our sister States, the Constitu-
tions of which embody provisions similar to those contained in
the Constitution of this State, *and in every instance, without excep-
tion, the constitutionality of the law has been affirmed.*

The Constitution of Pennsylvania declares that " all men have
a natural and indefeasible right to worship Almighty God accord-
ing to the dictates of their own consciences; no man can, of
right, be compelled to attend, erect, or support any place of
worship, or to maintain any ministry against his consent; no
human authority can, in any case whatever, control or interfere
with the rights of conscience; and no preference shall ever be
given by law to any religious establishments or modes of wor-
ship." The Legislature of Pennsylvania passed an act, which,
among other things, prohibited any person to " do or perform
any worldly employment or business whatever on the Lord's
day, commonly called Sunday, works of necessity or charity only
excepted."

For a violation of this statute, one Specht was prosecuted be-
fore a justice of the peace. In his defence, he tendered a plea
that he was a member in full communion of the Seventh-Day
Baptist congregation, and that he conscientiously believed that
the seventh day of the week was the true Sabbath of the Lord,
and that he accordingly observed it as such. The justice refused
to enter the plea, and sentenced the defendant to pay a fine.
The Court of Common Pleas affirmed the judgment, and the de-
fendant took the case to the Supreme Court. It was urged on
his behalf that the statute controlled or interfered with the rights
of conscience; that it treated the first day of the week as a *sacred*
day, and prohibited labor on that day, not for the purpose of
giving rest to man as a mere civil regulation, but because it *pro-
faned the Lord's day,* and was therefore within the prohibition of
the Constitution. But the Court affirmed the judgment, and
said : " All agree that to the well-being of society periods of rest
are absolutely necessary. To be productive of the required ad-
vantage, these periods must recur at stated intervals, so that the
mass of which the community is composed may enjoy a respite
from labor at the same time. They may be established by com-
mon consent, or, as is conceded, the legislative power of the
State may, without impropriety, interfere to fix the time of their
stated return, and enforce obedience to the direction. When
this happens, some one day must be selected, and it has been
said, the round of the week presents none which, being preferred,
might not be regarded as favoring some one of the numerous

religious sects into which mankind are divided. In a Christian community, where a very large majority of the people celebrate the first day of the week as their chosen period of rest from labor, it is not surprising that that day should have received the legislative sanction; and as it is also devoted to religious observances, we are prepared to estimate the reason why the statute should speak of it as the Lord's day, and denominate the infraction of its legalized rest a profanation. *Yet this does not change the character of the enactment. It is still, essentially, but a civil regulation, made for the government of man as a member of society.*" (Specht *v.* Commonwealth, 8 Barr, 312.)

The Constitution of South Carolina declares, like the Constitution of this State, that "the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall for ever hereafter be allowed within this State to all mankind." An ordinance of the city of Charleston prohibited the sale of goods on Sunday, under which a Hebrew was prosecuted. The case was taken to the Court of Appeals, where it was contended that the ordinance was in conflict with the Constitution. But the Court held the ordinance valid, and said:

"If the Legislature, or the city of Charleston, were to declare that all shops within the State or city should be closed, and that no one should sell, or offer to sell, any goods, wares, or merchandise, on the fourth of July or eighth of January, in each year, would any one believe such a law was unconstitutional? It could not be pretended that religion had anything to do with that? What has religion to do with a similar regulation for Sunday? It is, in a political and social point of view, a mere day of rest. Its observance, as such, is a mere question of expediency. (City Council *v.* Benjamin, 2 Strob., 529.)

The Constitution of Ohio, of 1802, contains a clause similar to the one cited above from the Constitution of Pennsylvania, and in Bloom *v.* Richards, (2 Warden, 388,) the validity of the statute of that State prohibiting common labor on Sunday was considered, and the Court said: "We are, then, to regard the statute under consideration as a mere municipal, or police regulation, whose validity is neither strengthened or weakened by the fact that the day of rest it enjoins is the Sabbath day. Wisdom requires that men should refrain from labor at least one day in seven, and the advantages of having the day of rest fixed, and so fixed as to happen at regular recurring intervals, are too obvious to be overlooked. It was within the constitutional competency of the General Assembly to require this cessation of labor, and to name the day of rest. It did so by the act referred to, and, in accordance with the feelings of a majority of the people, the Christian Sabbath was very properly selected. But, regarded merely as an exertion of legislative authority, the act would have had neither more nor less validity had any other day been adopted."

34

In twenty-five States of the Union, the statutes of which I have been able to examine, there are laws prohibiting secular business on Sunday, and in every one of these States, their validity has been upheld either by sustaining convictions had under them, or by annulling contracts made in violation of their provisions, or directly upon the question of their constitutionality.

In Shover v. The State, the Supreme Court of Arkansas held that the act prohibiting the keeping open of any store or the retail of any goods, etc., on Sunday could not, *with any propriety*, be said to trench upon any of the rights secured by the Constitution. (5 Eng., 262.)

This concurrence of opinion by the tribunals of so many different States, composed, in most instances, of Judges of distinguished ability and profound learning, ought to conclude the question before us. I do not assent to the proposition announced in Bryan v. Berry, (6 Cal., 398,) that the decisions of other Courts are authority and to be respected only from the reasoning upon which they are based. The proposition is not sound, except in a very restricted sense. The law is a science, whose leading principles are settled. They are not to be opened for discussion upon the elevation to the bench of every new Judge, however subtle his intellect, or profound his learning, or logical his reasoning. Upon their stability men rest their property, make their contracts, assert their rights, and claim protection. It is true that the law is founded upon reason, but by this is meant that it is the result of the general intelligence, learning, and experience of mankind, through a long succession of years, and not of the individual reasoning of one or of several judges. "Reason," says Lord Coke, "is the life of the law, nay, the common law itself is nothing else but reason, which is to be understood of an artificial perfection of reason, gotten by long study, observation, and experience, and not of every man's natural reason." It is possible that some intellects may rise to the perception of absolute truth, and be justified in questioning the general judgment of the learned of mankind. But before the legitimate and just inference arising from the general acquiescence of the learned can be avoided, the error in the principles recognized should be clearly shown. We should not blindly adhere to precedents, nor should we more blindly abandon them as guides.

In the present case, the question under consideration is one of power dependent upon the construction of sections of the Constitution. The rules of construction are settled, and possess all the certainty which can exist out of the exact sciences; they do not vary in different Courts; they are the same now that they were a century ago; they are the same now that they will be a century hence; and a concurrence upon their application, of the

highest tribunals of every State where a Sunday law exists, in the same judgment, ought to inspire confidence in its soundness.

I pass to the consideration of the first section of the Constitution, which places among the inalienable rights of men " those of enjoying and defending life and liberty ; acquiring, possessing, and protecting property; and pursuing and obtaining safety and happiness." This section embodies great principles of inestimable value, but was never intended to inhibit legislation upon the rights enumerated. Men have an inalienable right to enjoy and defend life and liberty, but the conditions of its enjoyment, the circumstances under which life may be forfeited, or liberty restrained, are the subjects of constant legislation. Men have an inalienable right to acquire, possess, and protect property, but the mode and manner of the acquisition, possession, and protection, are matters upon which laws are passed at every session of the Legislature. Men have an inalienable right of pursuing and obtaining safety and happiness, but subject to such restrictions as the public good may require.

The rights enumerated in the section are to be enjoyed in a constitutional government in subordination to the general laws of the State.

That the Legislature possesses the power to legislate for the good order, the peace, welfare, and happiness of society, is not denied. The means by which these ends are to be effected are left to its discretion. The existence of discretion implies a liability to abuse, but because the discretion of the Legislature may be abused, its acts are not, for that reason, void. It is no argument against the existence of the power to establish a day of rest that it may be exerted to the prohibition of labor for six days in the week instead of one. There is no single power which may not be so exercised as to become intolerable. The only limitation upon the exercise of the taxing power is that the taxation must be equal and uniform. The extent of the tax is not controlled, that rests in the discretion of the Legislature ; it may amount to nearly the entire value of the property upon which it is laid. It is to be supposed that the members of the Legislature will exercise some wisdom in its acts ; if they do not, the remedy is with the people. Frequent elections by the people furnish the only protection, under the Constitution, against the abuse of acknowledged legislative power.

All sorts of restrictions and regulations are placed upon the acquisition and disposition of property. What contracts are valid, and what are invalid, when they must be in writing, and when they can be made by parol, what is essential to transfer chattels, and what to convey realty, are matters of constant legislation. Some modes of acquisition are subject to licenses, and some are prohibited. The right to acquire property, like the use of it, must be considered in relation to other rights. It may be

regulated for the public good, though thereby the facility of acquisition is lessened, as in the sale of gunpowder and drugs, and in the practice of different professions.   Men have a right to the labor of their children or slaves, yet the Legislature may fix reasonable periods of labor, as is done in regard to children in factories, and in regard to slaves, in some instances.   To say that a prohibition of work on Sunday prevents the acquisition of property, is to beg the question.   With more truth it may be said, that rest upon one day in seven better enables men to acquire on the other six.

If it be admitted that the Legislature possesses the right to restrain each one in his freedom of conduct only so far as is necessary to secure protection to all others, from every species of danger to person, health, and property, no inference can be drawn against the validity of the act under consideration.   The character and mode of protection, and what is dangerous to the person, or to health and property, must necessarily be left to its determination, and in the first section of the Constitution no inhibition to the exercise of its power in this respect can be found.   The prohibition of secular business on Sunday is advocated on the ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society promoted.   The Legislature has so considered it, and the judiciary can not say that the Legislature was mistaken, and, therefore, the act is unconstitutional, without passing out of its legitimate sphere, and assuming a right to supervise the exercise of legislative discretion in matters of mere expediency.   Such right, as I have already observed, does not belong to the judiciary.   Its assumption would be usurpation, and well calculated to lessen the just influence which the judiciary should possess in a constitutional government.

"Questions of policy and State necessity," says Sedgwick, "are not to be assigned to the domain of the Courts; and I can not but think it unfortunate for the real influence of the judiciary that this authority has ever been claimed for them." (Interp. of Statutory and Cons. Law, 182.)

"We can not declare," says Mr. Justice Baldwin of the Supreme Court of the United States, "a legislative act void, because it conflicts with our opinions of policy, expediency, or justice. We are not the guardians of the rights of the people of the State, unless they are secured by some constitutional provision which comes within our judicial cognizance.   The remedy for unwise or oppressive legislation, within constitutional bounds, is by appeal to the justice and patriotism of the representatives of the people.   If this fail, the people in their sovereign capacity can correct the evil, but Courts can not assume their rights."   (Bennett *v.* Boggs, 1 Bald., 74.)

I am of opinion that the "Act for the better observance of the

Sabbath," is constitutional, and that the petitioner ought to be remanded.